OPINION OF THE COURT
Arthur W. Lonschein, J.
In this case the Police Department of the City of New York seeks extraordinary injunctive relief, of a nature unprecedented in New York, to control a street prostitution business. The chief component of this relief is the exclusion of certain individuals from the Queens Plaza area: essentially a civil banishment. The City justifies this application with two claims. First, it claims that the prostitution business involved has essentially taken over the streets of the area during the night, and that it is so open, intrusive and pervasive during this time, with such intolerable side effects, as to constitute a public nuisance. Second, the City claims that even though it has identified the responsible individuals, criminal prosecution is inadequate to control the illegal activity, both due to difficulties in prosecution and due to the unwillingness of the Criminal Court to impose sufficiently severe punishment.
The motion was brought on by way of order to show cause, which included the terms of the proposed preliminary injunction as temporary restraining orders. Since the injunction is extraordinary and unprecedented, and since it has clear constitutional implications, I struck most of the temporary restraining order, preferring to await the return of the motion for a hearing as to whether the City could prove its allegations and justify the injunction. Further, since the defendants seemed unlikely to be able to present the constitutional issues on their own, on my own motion I directed the service of the order to show cause on the New York Civil Liberties Union and invited its presence in the action, and participation at the hearing, as amicus curiae. I also took the unusual step of allowing service of the order to show cause on a Sunday, as permitted by Judiciary Law § 5, on the representation of the City’s counsel that the defendants could be found in the Queens Plaza area late on Saturday nights and into Sunday mornings. The District Attorney of Queens County has also submitted a brief as amicus in support of the motion.
The City has demonstrated that the Queens Plaza area has indeed been overrun with prostitution activity during the late night hours. As to every other aspect of this action, and on every other level of analysis, the action fails. The City has *535 failed in the elementary matter of serving most of the defendants with the summons.[1] At the hearing, the City failed to prove that any of the defendants, served or unserved, individually or as a group, are responsible for the prostitution activity, or that their civil banishment would bring it under control. The City has failed to prove its contention that criminal processes are inadequate to deal with the situation, or even that the defendants have been arrested and prosecuted for the activities. There is a complete failure to prove the allegation that the Criminal Court has shirked its responsibilities.
These failures, of themselves, require me to deny the injunction and dismiss the action. Beyond that, I believe that the City’s conception of the law is fundamentally unsound, and that the present state of the law in this State will not allow the relief of civil banishment under any of the circumstances alleged here. Even if the City had obtained jurisdiction over the defendants, and even if it had proven its factual claims, as a legal matter the City has failed to demonstrate that the proposed injunction is a constitutionally permissible response to those claims, and I conclude that it is not constitutionally permissible. Assuming that it is constitutionally permissible, the City has failed to demonstrate that the injunction is a proper or provident exercise of the court’s equity powers, and I conclude that it is neither proper nor prudent. In particular, the City has failed in its attempt to characterize the injunction as proper under existing nuisance principles, and I conclude that it is not proper under those principles. Most troubling of all, the responsible City officials have demonstrated a fundamental misunderstanding of the role of this court in addressing criminal activity as a civil matter. So that the City will not be misled by a dismissal based upon a failure of proof only, I will state the reasons for these conclusions.
The City’s Claims and Demands for Relief
The Queens Plaza area is located at the foot of the Queensboro Bridge. It is one of the major entranceways to Queens and *536 indeed to the rest of Long Island. In addition to being a conduit for the vehicular traffic to and from Manhattan over the bridge, the area is a major hub for public transportation, where all three subway lines serving the City meet and have stations.
The City sues 21 named defendants, each of whom is described as a member or affiliate of a criminal street gang known as the “Bloods.” It is alleged that these defendants, individually and collectively, have created and maintained an ongoing street prostitution operation which has overwhelmed the Queens Plaza area. It is alleged that the female defendants are prostitutes, and that the male defendants are the pimps who set up, control, and profit from their prostitution activities. It is further alleged that between the hours of 11:00 p.m. and 7:00 a.m. these activities are so intense, widespread, and pervasive within the Queens Plaza neighborhood as to have essentially taken it over, in that they slow vehicular traffic, block sidewalks, impede pedestrian traffic and entrance to the Queens Plaza subway station, and interfere with the operation of local businesses. It is alleged that the defendants’ activities lead to the routine solicitation of passersby for prostitution, to violent criminal acts related to the interaction of gang members with competing criminal elements, to the littering of the public streets with used condoms, to public urination, and to noise. All of this, it is alleged, constitutes a public nuisance which requires the court’s intervention. It is alleged that all of this activity and public nuisance is created by the defendants on behalf of, and for the financial benefit and support of, the Bloods gang. It is alleged that none of the defendants reside or work in the Queens Plaza area other than as part of the prostitution operation.
The complaint is against the named individuals only. No claim is made against the Bloods gang as a group, or against any “John Doe” defendants. No explanation is offered as to why these particular individuals were chosen for this action, and none was offered at the hearing or in the posthearing memoranda.
The complaint alleges that “continued and escalated law enforcement activities in the subject neighborhood have failed to date, to abate permanently the public nuisance created and maintained by defendants.”
The affidavits of police officers in support of the application provide a number of supporting allegations beyond those specified by the complaint. It is alleged- in those affidavits that the street prostitution activities lead to numerous other crimes, such as robbery, which go largely unreported.
*537 It is alleged that the Bloods gang had established a thriving prostitution business in the East New York section of Brooklyn. Due to certain incidents with rival operators, described as a “spate” of violence against them by rival pimps, the Bloods moved their operation, literally overnight, to the Queens Plaza area. The gang has allegedly laid a territorial claim to the Queens Plaza area, which it advertises by means of graffiti “tags.”
The allegation of the complaint as to the inability of the police to stop the criminal activity is fleshed out in the affidavits by allegations that the female defendants are hardened recidivists, who have already been arrested numerous times for prostitution activities and returned to them. It is claimed that these arrests are of little enforcement value, since they are “routinely disposed of through plea bargaining to a disorderly conduct charge and the imposition of a modest fine and release.” (Plaintiffs posthearing mem, at 9.) The male defendants, the pimps, have allegedly escaped arrest because while they brazenly appear in the street and in a local donut shop, they are never seen taking money from the prostitutes, and a prostitute would be risking her life to testify against them.
In response to this situation, the City seeks numerous forms of injunctive relief against the named individuals.[2] Of particular interest, and the focus of the City’s application, is the first demand for relief. The City seeks, in item A, nothing less than *538 the civil banishment of the named individuals from the Queens Plaza area between the hours of 11:00 p.m. and 7:00 a.m. While the literal terms of the item only prohibit the defendants from appearing “in public view,” there can be no doubt that the defendants would be completely unable to comply unless they stayed out of the area entirely. If they were to be seen walking on the streets or driving to the Queensboro Bridge, or even taking the subway to Manhattan, they would be subject to a contempt proceeding. This demand is completely unprecedented in my experience, and the City points to no New York precedents even remotely similar to it.
Of the other forms of relief, items B, C, D and E simply restate in injunctive form existing proscriptions of the Penal Law, although item E adds to its list of proscribed items “any other object capable of inflicting serious bodily injury.” This is literally a catch-all provision, as virtually any object can inflict such injury, given the right conditions or sufficiently malicious intent. Items F through L address activities alleged by the City to be ancillary to the prostitution business. Of these, items G, H and L are similar to Penal Law provisions, but are significantly broader than them due to the inclusion of poorly defined catch-all terms such as “approaching” or “confronting” individuals. These activities are not criminal in themselves. The City essentially concedes that this aspect of its application is likewise unprecedented in New York.
Analysis
It is well settled that a party seeking a preliminary injunction must establish three things: irreparable injury absent the injunction, a likelihood of success on the merits, and that a balancing of the equities favors granting the injunction (Albini v Solork Assocs., 37 AD2d 835; Grant Co. v Srogi, 52 NY2d *539 496). The City has accepted, in its memorandum of law in support of the motion, that this standard applies here.[3]
The City has proven that the Queens Plaza area is plagued by the prostitution trade, openly, brazenly and defiantly conducted on the streets. In addition to the testimony of the witnesses concerning their observations, a videotape was shown to me, which demonstrated the volume of this traffic. The City has proven most if not all of its allegations regarding the deleterious effects on the neighborhood which this business produces.
In 1976, the Legislature enacted Penal Law § 240.37 (L 1976, ch 344), “Loitering for the purpose of engaging in a prostitution offense,” making the following findings of fact concerning the social effects of the street prostitution trade:
“The legislature hereby finds and declares that loitering for the purpose of prostitution, patronizing or promoting prostitution is disruptive of the public peace in that certain persons engaged in such conduct in public places harass and interfere with the use and enjoyment by other persons of such public places thereby constituting a danger to the public health and safety.
“The legislature further finds that in recent years the incidence of such conduct in public places has *540 increased significantly in that persons aggressively engaging in promoting, patronizing or soliciting for the purposes of prostitution have, by their course of conduct in public places, caused citizens who venture into such public places to be the unwilling victims of repeated harassment, interference and assault upon their individual privacy, as a result of which such public places have become unsafe and the ordinary community and commercial life of certain neighborhoods has been disrupted and has deteriorated” (L 1976, ch 344, § 1, reprinted in McKinney’s Cons Laws of NY, Book 39, following Penal Law § 240.37).
The accuracy of this legislative finding is all too clearly borne out by the proof before me. The disruption to the Queens Plaza neighborhood and the impositions made upon legitimate businesses by the prostitutes, their pimps and their customers are clearly documented. This proof gives the lie to those who claim that prostitution is a victimless crime. I will accept, for the purposes of this case, that the prostitution situation in Queens Plaza is a public nuisance in any realistic sense of that term, and that irreparable harm has been demonstrated.
It does not follow, however, that the City has successfully shown that it is these defendants who have created that nuisance, or that it has justified the remedy it seeks to impose. It has not done either. It has not demonstrated any likelihood of success on the merits, and the balance of the equities tips decidedly against the extraordinary injunction the City has proposed.
In conducting this hearing, I allowed the City’s counsel the most extraordinary latitude in questioning their witnesses. Much of the testimony regarding the defendants went beyond mere hearsay, and consisted of general reputation among police officers or mere rumor. Had the defendants been represented by counsel devoted to their interests,[4] the bulk of the testimony directly related to the defendants would properly have been objected to and little if any would have been left. The witnesses repeatedly testified to what they claimed they or the Police Department in general “knew” about the defendants, *541 when in fact they were testifying to subjective conclusions they had drawn. The underlying observations and other facts which might support these conclusions were rarely stated. When stated, the actual observations were insufficient, as a matter of law, to sustain the legal conclusion that the defendants were guilty of the criminal activity ascribed to them.
I allowed the objectionable questions and testimony, since there was no jury, since the situation complained of is a serious one, and in order to ascertain the weight of the City’s case. That does not mean that I must credit the flagrantly improper and inadmissible testimony as establishing the facts.
There is evidence that the female defendants are in fact habitual prostitutes, who have been repeatedly arrested for prostitution offenses. As to most of them, however, the evidence is that they were arrested in Brooklyn, not Queens Plaza, and so their criminal histories are irrelevant to this case. Only one of the defendants actually served with the summons, Tasha Green, also known as Martha Brown, has actually been arrested for repeated prostitution offenses in Queens, and there is no proof as to the disposition of these cases.[5]
Missing is any hard factual support for the City’s allegations that the male defendants are in fact pimps who are responsible for the prostitution business. The few hard facts testified to are certainly suggestive, but mere suggestions will not suffice. Since the essence of the City’s position is that the Bloods gang members control the prostitution business, with the female defendants their mere tools, proof as to that control is indispensable. Had the City firmly proven its allegations concerning the prostitution of the female defendants, and if I were thereupon to issue an injunction against them alone, the failure to justify an injunction against their pimps would still render this action pointless. The pimps, undeterred, would simply replace their employees and no one in Queens Plaza would notice the difference.
Even more glaring is the omission of any evidence whatsoever that the proposed injunction will in fact accomplish the goal set by the City: the alleviation of the prostitution problem in the Queens Plaza area. All of the City’s arguments in favor of the injunction rely, at bottom, on a balancing of the *542 purported benefit to the public against the limitation of the defendants’ right to be in the area. One of the many fundamental defects in the City’s position is that it has not established that this benefit is likely to result from the injunction. None of the witnesses offered the opinion that these defendants control the Queens Plaza territory in its entirety, or even that their exclusion from the Queens Plaza area would put a significant dent in the over-all operation.
The City has chosen to proceed against specific named individuals, rather than against the Bloods gang as a group.[6] The proposed injunction, by its terms, would apply to the named defendants only, and not to all Bloods members or affiliates. As noted previously, the City has not explained why these 21 defendants were chosen, but they alone cannot be responsible for the volume of prostitution activity which the City has shown to exist. The consequence of this choice, however, is that the City must show the necessity for relief, and propriety and adequacy of its proposed remedy, based upon the actions of these defendants alone. To the extent that the City portrays the perpetrators of the nuisance as the Bloods gang generally, it has defeated its own purpose. None of the witnesses even offered an opinion to the effect that if the defendants, together with all of their Bloods affiliates, were excluded from the area then the prostitution business there would cease, or even be significantly limited.
Rather, the indication from the evidence is that the defendants and their Bloods affiliates had a thriving prostitution business in East New York, found that area to be too competitive, and simply moved their operation overnight to Queens Plaza. There was no proof as to whether the Bloods pushed earlier pimps out of Queens Plaza or whether they were pioneers, but even supposing that all the defendants and all of their Bloods affiliates were excluded from the area, there is no reason at all to suppose that other entrepreneurial spirits would not fill the vacuum. There was not a word spoken concerning how the injunction would reduce the demand for these services, or deter would-be customers from continuing to come to Queens Plaza. It would certainly seem likely that the customers would continue to come to the area, and that there are more than enough pimps and prostitutes available to accommodate them.
*543 I certainly do not accept the defeatist attitude that nothing can be done to limit or suppress the world’s oldest profession, or the equally defeatist attitude that since total eradication is unattainable, more limited remedies are pointless. The success of the Nuisance Abatement Law (Administrative Code § 7-701 et seq.) as a tool in the suppression of open and notorious houses of prostitution in this City shows firmly to the contrary (see, e.g., City of New York v Taliaferrow, 158 AD2d 445; City of New York v Jai Balaji, 176 Misc 2d 719). Indeed, as the Justice assigned to all nuisance abatement cases in Queens, over the last few years I have directed the closing of dozens of houses of prostitution, pursuant to the provisions of that law, in all parts of Queens. Similarly, I have pursuant to that law directed the closing of well over a hundred other illegal businesses which created a nuisance in their neighborhoods, such as crack houses, fencing operations, illegal sales of liquor, gambling dens, nude dancing establishments and the like. Other Justices have done the same in the other counties of this City.
These orders have been based on a statute which clearly states the grounds upon which relief may be granted, and which clearly spells out the nature of the closing orders, injunctions, and fines which it permits. They have also been based upon complaints, affidavits and conviction records which clearly show that the defendants involved have done the acts ascribed to them. That the Nuisance Abatement Law has engendered so little case law despite the hundreds, if not thousands, of actions brought City-wide under its provisions is an indicator of its clarity and effectiveness.
A balancing of the equities requires, however, that the motion may only be granted if the harm the movant would suffer absent the injunction is greater than the harm to be imposed upon the opponent by the injunction (Fischer v Deitsch, 168 AD2d 599). The court is required to look to the relative prejudice to each party accruing from a grant or a denial of the requested relief (Sau Thi Ma v Xuan Lien, 198 AD2d 186). Here, where the proposed injunction is so extraordinary and completely unprecedented, this aspect of the three-pronged test takes on even more than its usual significance. Where the injunction has not been shown to produce any tangible benefit to the City, while greatly limiting the defendants’ freedom to travel about the City and remain where they choose, rights of constitutional dimensions as will be discussed below, I will not seriously consider it in the absence of clearly proven allega *544 tions of wrongdoing and equally clearly proven allegations of substantial benefit to the City.
It may well be true, as the police believe and the City alleges, that the male defendants are indeed pimps, skulking in the shadows, hiding their activities from view and cowing the prostitutes into silence by acts and threats of violence. That pimps in general would be so base, cowardly and despicable is not to be wondered at. A court of law cannot act on subjective beliefs but must insist upon proof. In this case, as to these defendants, the proof is lacking. No matter what the legal merits of the City’s claims may be, this failure must result in the dismissal of the complaint.
Any further discussion is, in a sense, academic. As noted at the outset, however, I deem it important that the City not be misled by a dismissal on narrow grounds. Therefore, I will proceed to a discussion of the constitutional and other legal implications of the civil banishment sought by the City. In what follows, I will not address the other aspects of the City’s demand for relief, which are less sweeping, less novel,' and less troubling.
Civil Banishment
There are two intertwined constitutional rights which are impacted by the proposed civil banishment of the defendants from the Queens Plaza neighborhood: the right to travel to and through the area, and every person’s right to remain in the public area of his or her choice.
The US Constitution protects a person’s right to interstate travel (Memorial Hosp. v Maricopa County, 415 US 250; Shapiro v Thompson, 394 US 618). The right to travel between and abide within the various States has long been regarded as so basic as to need no particular constitutional expression (see, United States v Guest, 383 US 745, 757-758; Shapiro v Thompson, 394 US 618, supra). Nonetheless, from time to time the Court has variously described the right to travel as being grounded in the Due Process Clause, the Privileges and Immunities Clause, the Fourteenth Amendment, and the Commerce Clause (see, Memorial Hosp. v Maricopa County, supra; Shapiro v Thompson, supra, 394 US, n 8). The right to travel within a State, while not receiving a great deal of attention from the High Court, has been regarded as equally fundamental. So, Justice Taney, in Passenger Cases (7 How [48 US] 283, 492 [1849]), justified the necessity of Americans being able to travel between the States “as freely as in our own States.” The *545 Court has, however, recently expressly left as an open question the extent to which this right also applies to travel within a State (Memorial Hosp. v Maricopa County, supra). In Lutz v City of York (899 F2d 255, 268), the Court of Appeals for the Third Circuit exhaustively reviewed the various case lines, and concluded that the “right to move freely about one’s neighborhood or town” exists as a matter of substantive due process, that it is “ ‘implicit in the concept of ordered liberty’ ” and “ ‘deeply rooted in the Nation’s history.’ ”
Our New York Court of Appeals has not had the occasion to delineate the extent to which this right applies to travel within the State pursuant to our State Constitution. The Appellate Division and the lower courts have adverted to such a right, but without giving it an extended explanation (see, Matter of Hauptman v New York State Dept. of Motor Vehicles, 158 AD2d 600; Matter of Devereaux v New York State Teachers’ Retirement Bd., 75 AD2d 277; see also, Matter of Kaehny v Lynn, 172 Misc 2d 295; Matter of Brown v Wing, 170 Misc 2d 554). In Town of Pompey v Parker (53 AD2d 125), the Appellate Division, Fourth Department, referring to the history of the right to interstate travel, stated that “[t]his right to travel and abide in any State is a basic right repeatedly recognized and guaranteed by the Constitution [citations omitted].”[7]
There can be no doubt that our State Constitution, no less than the Federal Constitution, supports the right to travel freely within the State. Our State Constitution includes a Rights and Privileges Clause (art I, § 1) essentially similar to the Privileges and Immunities and to the Due Process Clauses of the Federal Constitution, and an Equal Protection Clause (art I, § 11) as broad as that found in the Federal Constitution (see, People v Smith, 97 Misc 2d 115). To the extent that the right to travel freely may be said to be a component of substantive due process, our State Constitution supports the right independently of the Federal Constitution.
The Federal Constitution further protects a person’s right to remain in the public area of his or her choice, and to loiter there for innocent purposes, according to inclination (City of Chicago v Morales, 527 US 41). In this State this right can be *546 limited by statutes which make the act of loitering for the purpose of committing various criminal offenses an offense in itself (see, e.g., People v Smith, 44 NY2d 613 [prostitution]; People v Pagnotta, 25 NY2d 333, 335 [for purposes of unlawfully using or possessing any narcotic drug]), or which penalize loitering in specific places of restricted public access (see, e.g., People v Merolla, 9 NY2d 62, 67, cert denied 365 US 872 [waterfront facilities]; People v Johnson, 6 NY2d 549, 550 [school building or grounds]; People v Bell, 306 NY 110, 113 [railroad or subway facilities]). Amtiloitering statutes which lack these features are generally stricken for vagueness, either in that they fail to distinguish between innocent and harmful conduct, thereby failing to notify the average citizen of what is prohibited, or because they vest essentially unlimited discretion in police officers (People v Bright, 71 NY2d 376, 383-384).
The parties are in agreement that the civil banishment portion of the injunction is unrelated to the defendants’ free speech or assembly rights. The City seeks to ban the defendants from the Queens Plaza area purely on the basis of what they have done, rather than on the basis of what they have said. Further, while the City bases its claim for relief in large part on the allegation that the defendants are members of a criminal gang, there is nothing in the injunction which would prevent them from associating with each other.
There can be no doubt that the injunction proposed by the City impacts substantially on the defendants’ rights to move freely about the City and to remain in the public areas of their choice. The next issue is therefore the standard to be applied in evaluating the motion.
In Madsen v Women’s Health Ctr. (512 US 753), the Supreme Court addressed an injunction which kept demonstrators a given minimum distance from an abortion clinic. The Court pointed out that the standards to be applied to injunctions which inhibit constitutional rights are different from those to be applied to ordinances having that effect. On the one hand, injunctions carry greater risks of discriminatory enforcement than ordinances of general application, but on the other hand they can be framed more precisely to the wrongful conduct involved. The Court held, therefore, that mere analysis of whether the injunction constituted a reasonable restriction on time, place and manner of expression was insufficiently rigorous. The Court held that the proper point of analysis was whether the injunction burdened no more speech than necessary to serve a significant governmental interest (512 US 753, *547 765). That case, to be sure, involved First Amendment concerns which are not relevant to the civil banishment injunction. I believe that a similar level of scrutiny is appropriate to the constitutional issues presented here: does the proposed injunction burden the defendants’ constitutional liberties any more than is required to serve the governmental interests involved? The City in its posthearing memorandum agreed that the injunction must be tailored to the specific activities complained of.
Viewed from that standpoint, it is clear that the City at once seeks to go too far, and not far enough. The City’s interests lie in suppressing the illegal prostitution traffic in the Queens Plaza, in restoring order and in allowing lawful businesses to flourish. Rather than tailor the proposed injunction to the prostitution offenses, the City seeks to prohibit all activity by the defendants in the Queens Plaza area: good, bad or indifferent, lawful or unlawful, innocent or guilty. The City seeks to proscribe the defendants’ presence in the area, when it is their activities of which it complains. It thus restricts the defendants’ liberties far more than is necessary to prohibit the illegal activity.
On the other hand, since there is no proof whatsoever that these defendants control the prostitution trade in the area, as distinct from merely participating in it, the proposed injunction does not in fact ensure that the defendants’ banishment will produce any corresponding benefit to the City by eradicating that trade.
The only virtue of the proposed civil banishment is that it is certainly not vague. The defendants would certainly understand the area which they could not lawfully enter, and their presence there would certainly trigger contempt remedies. There would be neither doubt nor unbridled discretion. This minor virtue, however, is not enough to justify throwing out the constitutional baby with the unlawful bathwater.
No case has been cited to me, from anywhere in the country, where an injunction including a civil banishment has been ordered by a trial level court, much less sustained after appellate review. In none of the cases relied on by the City did the scope of injunctive relief come close to a civil banishment, and the City’s failure to come to grips with the unprecedented nature of this injunction is itself breathtaking.
People ex rel. Gallo v Acuna (14 Cal 4th 1090, 929 P2d 596, supra, cert denied Gonzalez v Gallo, 521 US 1121) is the case closest to this in terms of the factual setting and in terms of *548 the injunctive relief upheld. The contrasts between the situations, however, the remedies employed and the sources of the courts’ authority are stark and instructive. The court in Acuna confronted what it described as an “urban war zone” and “an occupied territory.” (14 Cal 4th, at 1100, 929 P2d, at 601.) Several urban gangs had commandeered a residential neighborhood known as Rocksprings for their drug bazaar, taking over the streets, lawns and homes, making “[mjurder, attempted murder, drive-by shootings, assault and battery, vandalism, arson, and theft * * * commonplace.” (14 Cal 4th, at 1100, 929 P2d, at 601.) Utilizing both criminal and civil public nuisance statutes as authority, the California court issued an injunction in which it addressed the gang activity. The injunction consisted of 25 provisions, of which the one relevant here is the first. The defendants were enjoined from:
“(a) Standing, sitting, walking, driving, gathering or appearing anywhere in public view with any other defendant herein, or with any other known [gang] member.” (14 Cal 4th, at 1135, 929 P2d, at 624.)
That is, the defendants were not forbidden from entering the Rocksprings neighborhood. They were forbidden from associating with each other within its borders, which is quite a different thing. The California Supreme Court upheld this provision against challenges of overbreadth and vagueness and concluded that it met the test, set forth in Madsen (supra), that it burdened the defendants’ free speech and associational rights no more than was necessary to meet the legitimate governmental interests involved.
The scope of the injunction approved by the California courts should be stressed, as illustrated in a later California case. In In re Englebrecht (67 Cal App 4th 486, 79 Cal Rptr 2d 89), a case following Acuna (supra), the petitioner had been arrested for contempt of an Acuna-type injunction. Part of his challenge in a habeas corpus proceeding was that the injunction prevented him from entering the so-called target area, where he had relatives. The Court of Appeal was at pains to point out that he was not forbidden from entering the area, only from associating with gang members therein (67 Cal App 4th, at 496, 79 Cal Rptr 2d, at 95).
Here, the situation is nowhere near as dire as was painted in Acuna (supra). Criminal activity there certainly is, but activity that is both less severe and less intense. The circulating brothel which the City depicts is a far cry from the “urban war zone” *549 in Rocksprings. Having established the existence of a less serious situation, the City proposes a more sweeping injunction: civil banishment instead of a prohibition of public association of gang members.
Moreover, the viability of Acuna (supra) may fairly be called into question after the holding of the Supreme Court in City of Chicago v Morales (527 US 41, supra). There, the High Court struck an ordinance that prohibited gang members from loitering with each other or with other persons in any public place. The Court found the ordinance void for vagueness. As noted, there are substantial differences between the standards used to evaluate ordinances, as in Morales, and those applicable to injunctions, as in Acuna. There are also substantial differences between the terms of the Chicago ordinance and the California injunction. The two cases do have in common a proscription against gang members associating with each other in public. Whether California’s approach could withstand scrutiny by the Supreme Court better than Chicago’s is not for this court to say. It is for this court to say, however, that Acuna does not provide adequate precedent for the injunction which the City seeks here, regardless of the effect of Morales.
Therefore, I must conclude that the injunction sought by the City here intrudes upon the defendants’ constitutional freedoms to travel and remain in the Queens Plaza area, far more than is necessary to serve the legitimate governmental interest in suppressing the prostitution trade there. On constitutional grounds, therefore, it may not be granted.
Aside from constitutional concerns, the injunction sought by the City is not a prudent or proper use of the court’s equity powers. I have noted at length its view that the civil banishment injunction goes far beyond that which is necessary to address the actual wrong the City claims the defendants are perpetrating. The City argues that the defendants have no legitimate business in Queens Plaza, would not go there at the times referred to in the injunction except to engage in the prostitution business, and so are not burdened by the proposed banishment. This argument misses the point. It is the City’s burden to justify the injunction as necessary to meet the wrong actually alleged. To put the matter in the traditional framework, the City has not established that a balancing of the equities favors this injunction.
The City seeks here to use the court’s civil equity powers to enforce the criminal law. This is not impermissible, especially where there are statutes allowing injunctive relief (see, n 3, *550 supra). In the absence of specific statutory authority, however, the court must be circumspect. '
“That a court of equity will not undertake the enforcement of the criminal law, and will not enjoin the commission of a crime, is a principle of equity jurisprudence that is settled beyond any question. There can equally be no doubt that the criminal nature of an act will not deprive equity of the jurisdiction that would otherwise attach.” (People ex rel. Bennett v Laman, 277 NY 368, 376 [1938].)[8]
That is to say, whether the conduct complained of is a crime will not ordinarily be a factor in determining whether to grant equitable relief: the focus must be on the conduct itself, and the interests which the plaintiff seeks to protect. If the conduct impairs a property right, equity will intervene (Lanvin Parfums v Le Dans, 12 AD2d 104; see generally, 55 NY Jur 2d, Equity, § 49).
A separate concept is that, as a general matter, the prosecution of criminal matters should be left to the criminal courts, and the remedies found there are generally considered to be sufficient (55 NY Jur 2d, Equity, § 49). That such prosecutions have been unsuccessful due to the reluctance of juries to convict is not a reason for equity to intervene (67 NY Jur 2d, Injunctions, § 99).
Here, the totality of numerous criminal acts has, without doubt, created a nuisance that adversely affects property interests not only of the City itself but of all the legitimate people and businesses in the Queens Plaza area. The mere incantation of the word “nuisance” does not mean that this situation is best treated by civil injunction, however. I have grave doubts that this nuisance is one which is amenable to equity jurisdiction at all. I certainly do not accept that the civil banishment proposed by the City is appropriate to the proven facts.
Again, comparison with the decision in People ex rel. Gallo v Acuna (14 Cal 4th 1090, 929 P2d 596, supra) is instructive. The court in Acuna was able to base its injunction on specific *551 criminal and civil statutes establishing the gang conduct as a public nuisance, and providing injunctive remedies.[9] Here, the court is asked to craft an unprecedented injunction, ad hoc, wholly on the basis of common-law principles. These principles do not compel the issuance of the injunction sought, the proof does not justify it, and I decline the invitation to go so far into uncharted territory.
The City has made it quite plain that it intends to use this injunction to bypass the Criminal Court, which it sees as providing inadequate relief. As to the male defendants, whom the City alleges are the organized pimps controlling the operation, the argument may fairly be said to come down to this: They know who the bad guys are, but they don’t have enough evidence to prove it in Criminal Court, and so they want to use the lesser civil standard of proof to get relief here.[10] Counsel for the City went so far as to state, at the outset of the hearing, that if I issued the injunction, it was not the City’s intent to address violations by way of civil contempt motions under the Judiciary Law, which of course require formal notice on papers (Judiciary Law § 756). Rather, the City intends to summarily arrest violators for criminal contempt under the Penal Law.[11] Counsel stated that this procedure is employed against violators of Nuisance Abatement Law injunctions, something which in my experience is in fact not done.
If such prosecutions are in fact undertaken, the City will of course find itself again in the Criminal Court, where it alleges its remedies are inadequate.[12]
*552 The City has absolutely failed to prove its scandalous innuendo that the Judges of the Criminal Court have been unwilling to enforce the law. The City’s attorneys claimed at the hearing that part of their lack of effectiveness in enforcing the prostitution laws in the Queens Plaza area is due to the low priority placed on this offense by the Criminal Court. They claimed to be faced with a classic “revolving door” situation, where the court puts the prostitutes back on the streets on the same night they are arrested, in effect allowing them to pay their fines by repeating their offenses.
As to the male defendants, allegedly the ones controlling the business, the proof is that they have not been arrested for prostitution offenses, much less gone through a revolving door. While there was proof that at least some of the female defendants have been arrested for prostitution offenses on numerous occasions, most of those arrests were not in the Queens Plaza area, but in the East New York section of Brooklyn and so are irrelevant here. Those who were arrested in Queens Plaza, save one as noted above, have not been served with process and are not properly before the court. There was no proof whatever that the female defendants have not received appropriate sentences when convicted.
I emphatically reject the notion that this court may serve as an ad hoc alternative to the Criminal Court. I do not sit in review of the sentencing decisions of the Judges of that court, and will not presume to evaluate those decisions as an element of this action. If the City finds itself aggrieved by a perceived leniency in those sentencing decisions, it can attempt to persuade the Judges to be more stringent. If the Judges cannot be so persuaded, recourse can be had to the Legislature, in an attempt to mandate stricter sentences.
For all of the above reasons, I must conclude that this action should be dismissed in its entirety.

. Only four of the defendants were served: George Winn, Kameak Kyser, Martine Souwerein, and Tasha Green. Of these, Winn and Souwerein appeared at the hearing. During the hearing it became clear from the plaintiffs witnesses that Winn had no connection to the activities at Queens Plaza and the action against him was dismissed. Despite the City’s assurances that it would continue to make efforts to serve the defendants, no further affidavits of service have been received, and no application for an extension of time to serve them has been made. The action as against the unserved defendants must of course be dismissed on jurisdictional grounds alone.

. The City seeks to enjoin them from:
“A. Standing, sitting, walking, driving, gathering or appearing anywhere in public view;
“B. Loitering for the purpose of engaging in a prostitution offense, as defined by New York Penal Law Section 240.37;
“C. Committing an act of prostitution and/or promoting prostitution as defined by Penal Law Sections 230.00, and 230.15 et seq.;
“D. Collecting, receiving, soliciting money, drugs or any other thing of value for prostitution services rendered or to be rendered;
“E. Possessing any weapons including, but not limited to, knives, box cutters, razors, concealed or loaded firearms, and any other illegal weapon as defined in the New York State Penal Law, and any other object capable of inflicting serious bodily injury;
“F. Blocking free access to the public sidewalks, streets and the areas surrounding the Subject Neighborhood;
“G. Approaching individuals or confronting, intimidating, annoying, harassing, threatening, challenging, provoking, assaulting or doing anything to obstruct or delay the free flow of pedestrian traffic;
“H. Approaching individuals or confronting, intimidating, annoying, harassing, threatening, challenging, provoking, assaulting or doing anything to obstruct or delay the free flow of vehicular traffic;
*538 “I. Littering or causing others to litter condoms and condom wrappers in the streets and sidewalks;
“J. Urinating in the streets, on the sidewalks, in alleyways, or anywhere in public view;
“K. Trespassing or encouraging others to trespass on any private property;
“L. In any manner confronting, intimidating, annoying, harassing, threatening, challenging, provoking, assaulting and/or battering any residents, patrons or person or persons who have provided information in support of this Complaint and in Support for Plaintiff’s request for a Temporary Restraining Order and Preliminary Injunction.”
The City contends that the terms of the injunction are based upon that approved by the California Supreme Court in People ex rel. Gallo v Acuna (14 Cal 4th 1090, 929 P2d 596). As will be seen below, this is true only in a loose sense, and the differences concerning the first item are especially significant.

. In cases involving violations of zoning ordinances, the Environmental Conservation Law, and certain other laws, ordinances and rules, there are statutes which provide for the availability of injunctive relief (see, e.g., Town Law § 268; Village Law § 7-714; ECL 71-0301; Public Health Law § 1102 [3]). In such cases the usual three-pronged test does not apply. No irreparable injury, special harm or damage to the public need be shown, nor need the inadequacy of remedies at law be demonstrated, for the commission of the prohibited act is sufficient to sustain the injunction (see, e.g., Town of Throop v Leema Gravel Beds, 249 AD2d 970 [zoning]; Incorporated Vil. of Williston Park v Argano, 197 AD2d 670 [zoning]; Town of Islip v Clark, 90 AD2d 500 [zoning]; State of New York v Brookhaven Aggregates, 121 AD2d 440 [environmental conservation]; City of New York v Village of Tannersville, 263 AD2d 877 [watershed protection]). The Nuisance Abatement Law (Administrative Code of City of NY § 7-701 et seq.) has such a provision (Administrative Code §§ 7-704, 7-706, 7-707; City v Bilynn Realty Corp., 118 AD2d 511), and in oral argument at the conclusion of the hearing the City’s attorneys seemed to argue that it applies here. The Nuisance Abatement Law applies to “commercial establishments and * * * property” being illegally used and maintained (Administrative Code § 7-701), and not to activities on the public streets, and none of its provisions have any applicability to this situation. The rule in these cases, and others like them, depends on the availability of a statutory right to injunctive relief for specified violations, and does not apply to all cases where the plaintiff alleges violations of statutes, even penal ones.

. The attorney supplied by the Civil Liberties Union was quite rightly at pains to note during the hearing that he did not represent any of the defendants. I intimate no inadequacy in his advocacy. To the contrary, his arguments at the hearing were cogent and most helpful, as have been the arguments made by both amici curiae in their posthearing memoranda of law.

. The District Attorney, as amicus, has submitted with his posthearing memorandum certificates of disposition of these arrests. This evidence was not submitted at the hearing and cannot be accepted at this late date. Moreover, the significance of the dispositions is not addressed in the memorandum.

. I intimate no opinion whether or not an action against the Bloods as a group would be feasible.

. On the other hand, in People v Morrill (101 AD2d 927), the Court stated explicitly that the right to travel applies only to interstate travel. The Federal Court of Appeals opinion cited for that proposition, however, is Sklar v Byrne (727 F2d 633), which goes only so far as to hold that the ordinance before it would withstand an equal protection challenge even if intrastate travel were protected.

. That the City cited this case in support of the issuance of this injunction is a measure of the distance it must stretch in order to find anything vaguely resembling precedent. People ex rel. Bennett v Laman (supra) was a case of the unlawful practice of medicine and a proposed injunction to desist from that practice, an offense and a remedy wholly different in character from those involved here. At one point in the hearing, counsel for the City attempted to derive the court’s power to issue this injunction by analogy to orders of protection, an attempt which wisely was not pressed in the post-hearing memoranda.

. Even the antiassociation provisions of the Acuna injunction are unprecedented in New York.

. I have deliberately not addressed the issue of the appropriate standard of proof, since the City has not proven its case under any standard.

. Counsel apparently had in mind a prosecution under section 215.50 (3) of the Penal Law, criminal contempt in the second degree, consisting of “Intentional disobedience or resistance to the lawful process or other mandate of a court.”

. Criminal contempt in the second degree is a class A misdemeanor. As against the female defendants, it is actually more serious an offense than the underlying prostitution offense, which is a class B misdemeanor (Penal Law § 230.00). It is also more serious an offense than loitering for the purpose of engaging in a prostitution offense. That normally is a violation, but becomes a class B misdemeanor if the defendant has previously been convicted of it or another prostitution offense (Penal Law § 240.37). As against the male defendants, criminal contempt is equivalent to the lowest level of promoting prostitution offenses, that in the fourth degree (Penal Law § 230.20), and less serious than any of the more aggravated degrees of promoting prostitution, which are felonies (Penal Law §§ 230.25-230.32).