*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0332P (6th Cir.)
File Name: 02a0332p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

PATRICIA JOHNSON; MICHAEL
AU FRANCE,
      *Plaintiffs-Appellees,*

     *v.*

CITY OF CINCINNATI,
      *Defendant-Appellant.*

No. 00-4477

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 98-00441—Susan J. Dlott, District Judge.

Argued: February 1, 2002

Decided and Filed: September 26, 2002

Before: MARTIN, Chief Circuit Judge; GILMAN, Circuit
Judge; EDMUNDS, District Judge.[*]

———————————

[*] The Honorable Nancy G. Edmunds, United States District Judge for
the Eastern District of Michigan, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:** Richard Ganulin, CITY SOLICITOR'S OFFICE, Cincinnati, Ohio, for Appellant.    Bernard F. Wong, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Richard Ganulin, CITY SOLICITOR'S OFFICE, Cincinnati, Ohio, for Appellant.  Bernard F. Wong, Cincinnati, Ohio, Raymond Vasvari, AMERICAN CIVIL LIBERTIES UNION OF OHIO FOUNDATION, Cleveland, Ohio, Scott T. Greenwood, GREENWOOD & ASSOCIATES, Cincinnati, Ohio, for Appellees.

MARTIN, C. J., delivered the opinion of the court, in which EDMUNDS, D. J. joined. GILMAN, J. (pp. 36-58), delivered a separate dissenting opinion.

_____

**OPINION**

_____

BOYCE F. MARTIN, JR., Chief Circuit Judge.  The City of Cincinnati appeals the decision of the district court declaring the City's drug-exclusion ordinance, Cincinnati Municipal Code § 755, unconstitutional on its face, and unconstitutional as applied to plaintiffs Patricia Johnson and Michael Au France, and awarding plaintiffs attorney fees. For the reasons set forth below, we AFFIRM the judgment of the district court.

I.

A.

On August 7, 1996, the City enacted the Ordinance to enhance the quality of life and protect the health, safety, and welfare of persons in neighborhoods with a "significantly higher incidence of conduct associated with drug abuse than other areas of the City." Cincinnati, Ohio, Ordinance No.

### IV.  CONCLUSION

The City of Cincinnati, as the majority recognizes, faces difficult challenges in its efforts to enhance the quality of life in drug-plagued neighborhoods and to protect the health, safety, and welfare of its citizens in those areas.  In my opinions, the ordinance was a constitutionally permissible means to reach that goal.  I therefore respectfully dissent.

229-1996, § 1(A), (D) (Aug. 7, 1996).  To advance this goal, the Ordinance excludes an individual for up to ninety days from the "public streets, sidewalks, and other public ways" in all drug-exclusion zones if the individual is arrested or taken into custody within any drug-exclusion zone for one of several enumerated drug offenses.[1]  Cincinnati Municipal Code § 755-5.  The Ordinance extends this exclusion for a year if the individual is convicted. *Id.*  The Ordinance defines drug-exclusion zones as "areas where the number of arrests for . . . drug-abuse related crimes for the twelve (12) month period preceding the original designation is significantly higher than that for other similarly situated/sized areas of the city." *Id.* § 755-1.

Excluded persons who violate the Ordinance are subject to prosecution for criminal trespass, a fourth-degree misdemeanor. *Id.*  The City's chief of police, however, must grant a variance to any person who proves that he or she (1) resided in the drug-exclusion zone prior to receiving the exclusion notice, or (2) was employed by, or owned, a business located in a drug-exclusion zone prior to receiving the exclusion notice. *Id*. § 755-11(2)(b).  Provided they have written regulations prohibiting "drug abuse-related activities by their clients and which have entered into a written agreement with the police division concerning the applicability of those rules," social service agencies may also grant variances "for reasons relating to the health, welfare, or well-being of the person excluded, or for drug abuse-related counseling services." *Id*.  Variances must be in writing and the individual must keep the variance with him or her at all times within a drug exclusion zone. *Id*. § 755-11(2)(c).  The

---

[1] The offenses include:  corrupting another with drugs in violation of R.C. 2925.02, drug trafficking in violation of R.C. 2925.03, drug abuse in violation of R.C. 2925.11 (except for minor misdemeanor violations), possessing drug abuse instruments in violation of R.C. 2925.12, possessing drug paraphernalia in violation of R.C. 2925.14, illegal processing of drug documents in violation of R.C. 2925.23, abusing harmful intoxicants in violation of R.C. 2925.31, trafficking in harmful intoxicants in violation of R.C. 2925.32, and offenses involving counterfeit controlled substances in violation of R.C. 2925.37. § 755-5.

variance becomes void if the holder violates its terms or is subsequently arrested for a drug offense. *Id*. § 755-11(2)(c), (d)(4).

The Ordinance provides an appeal mechanism whereby an excluded individual may file a written request for a hearing within five days of receiving an exclusion notice. *Id*. §§ 755-11; 755-13(a). On appeal, the City must prove, by a preponderance of the evidence, that the excluded individual committed a specified drug offense in a drug-exclusion zone. *Id*. § 755-11(1)(c). The City can sustain or vacate the exclusion notice being challenged, and that determination "is a quasi-judicial decision and is final subject only to appeal to a court of competent jurisdiction." *Id*. § 755-13(C)(c), (D).

In September 1998, the City Council designated Over the Rhine – a mixed residential/commercial neighborhood located immediately north of the City's downtown business district – a drug exclusion zone. The City's designation of Over the Rhine followed a police report examining City-wide drug arrests from June 1996 to May 1997. The report, which was subsequently incorporated into the Ordinance's factual findings, detailed that 18.7% of City drug arrests occurred in Over the Rhine. According to the report, reducing the number of drug offenses in Over the Rhine was extremely difficult because many arrested individuals returned to the neighborhood immediately upon release. Citing Portland, Oregon's 38% crime reduction in certain neighborhoods following the establishment of a drug exclusion ordinance, the police report characterized a drug-exclusion ordinance as an additional tool to reduce crime and improve the quality of life in Over the Rhine.

In 1998, the City amended the Ordinance to provide that the ninety-day exclusion period terminates upon acquittal, dismissal of charges, or failure to prosecute.

sanction applied was already a crime, noting that "Congress may impose both a criminal and a civil sanction in respect to the same act or omission") (internal quotation marks omitted).

The plaintiffs concede that the sixth factor, which requires asking "whether an alternative purpose to which [the sanction] may rationally be connected is assignable for it," does not support a conclusion that the ordinance imposed criminal sanctions. In particular, the City enacted the ordinance in an attempt to improve the quality of life within drug-exclusion zones and to protect the health, safety, and welfare of its citizens in those neighborhoods. This purpose is rationally related to the ordinance's sanction of exclusion.

Finally, in considering the seventh factor's focus on comparing the nature of the sanctions to the civil purpose or the ordinance, I do not find the exclusions excessive in relation to the legitimate governmental goals involved. As noted above, the potentially harsh effects of the ordinance are mitigated through the availability of variances.

The preceding analysis demonstrates that only the first and fourth factors—which focus upon whether the sanction involves an affirmative disability or restraint and whether the penalty serves a retributive or deterrent purpose—support a finding that the exclusion is a criminal punishment. But neither of these considerations provides especially strong support for the plaintiffs' position. All of the other factors lead to the conclusion that the ordinance was not "so punitive either in purpose or effect as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 99 (internal quotation marks and citations omitted) (alteration in original). I thus conclude that the plaintiffs have failed to sustain their high burden of presenting "the clearest proof" that the ordinance was a criminal penalty notwithstanding its designation by the City as a civil remedy. *Id*. at 100. As a result, the ordinance's sanctions did not violate the Double Jeopardy Clause. I would therefore reverse the judgment of the district court on this issue.

The third *Mendoza-Martinez* factor requires a determination of whether the sanction "comes into play only on a finding of scienter." Because exclusion notices could be given to individuals arrested for drug crimes without any finding of *mens rea*, criminal intent is not required to impose the sanction. This factor favors the City's position that the exclusion is a civil sanction rather than a criminal punishment.

With regard to the fourth factor, which focuses on whether the sanction serves a retributive or deterrent purpose, even the City concedes that the ordinance would have a deterrent effect. Deterrence, in fact, was the very purpose of the ordinance. But the likely deterrence "is insufficient to render a sanction criminal, as deterrence may serve civil as well as criminal goals." *Hudson*, 522 U.S. at 105 (internal quotation marks omitted). Moreover, the existence of the variances counters any suggestion that the ordinance was designed as a means of retribution. I therefore find that this factor, although somewhat helpful to the plaintiffs, does not weigh heavily in their favor.

The fifth factor—"whether the behavior to which [the sanction] applies is already a crime"—does not support a conclusion that the ordinance imposed criminal penalties. Exclusion occurred only if a person was arrested or convicted of a drug offense in a drug-exclusion zone. In contrast, the criminal laws that such a person violated apply regardless of where the crime is committed. The particular behavior to which the ordinance applied, defined in this manner, was not a separate crime. Equally important, the fact that both criminal penalties and the ordinance's sanctions could be imposed for the same underlying drug offenses was insufficient to make the exclusion criminally punitive. *Hudson*, 522 U.S. at 105 (noting that a sanction is not necessarily punitive simply because the conduct for which it is imposed is also a criminal offense); *United States v. Ward*, 448 U.S. 242, 249-51 (1980) (holding that the imposition of a fine for violations of the Federal Water Pollution Control Act was a civil penalty even though the behavior to which the

### B.

Johnson was arrested on March 18, 1998, for a marijuana trafficking offense in Over the Rhine. At the time of her arrest, she variously lived with Katrina Chambers and Frank Johnson, two of her adult children. Marquisa Harmon, Johnson's other adult daughter, resided in Over the Rhine. Johnson did not reside with Harmon, but she helped care for Harmon's five minor children and regularly took two of the children, Tania and Jaquanna, to school.

As a result of her arrest, Johnson received an exclusion notice prohibiting her from entering Over the Rhine from March 24, 1998, until June 22, 1998. Because she was not a bona fide resident of, or employed in, Over the Rhine, Johnson did not qualify for a variance, and she did not appeal her exclusion notice.

After an Ohio grand jury took no action on the marijuana trafficking charge against Johnson, the case against her was terminated on March 27, 1998. Because the Ordinance had not yet been amended to provide for immediate termination of the exclusion, Johnson remained banned from Over the Rhine. Thus, when Johnson was found within Over the Rhine on April 8, 1998, the City charged her with criminal trespass. This charge was dismissed on February 8, 1999.

Au France, a homeless man, was first arrested in Over the Rhine for possession of drug paraphernalia in October 1996. He was convicted of this offense on November 11, 1996. He was subsequently arrested and convicted for multiple Ordinance violations and additional drug-related crimes in the neighborhood. As a result of these arrests, convictions, and related exclusions, Au France claims he was prohibited from entering Over the Rhine for four years and spent over four hundred days in jail.

Au France regularly sought food, clothing, and shelter from social service organizations located in Over the Rhine. Moreover, Au France's attorney's office is located in Over the Rhine. Au France applied for a variance on November 17,

1998. The City denied his application, citing his criminal record and lack of a permanent residence in Over the Rhine.

### C.

Johnson initially filed suit on June 19, 1998, and both Johnson and Au France filed an amended complaint on December 18, 1998. The plaintiffs alleged that the Ordinance (1) unconstitutionally infringes on their rights to freedom of speech and freedom of association; (2) infringes on their right to freedom of movement in intrastate travel in violation of the Fourteenth Amendment's Due Process and Equal Protection Clauses; (3) violates the Eighth Amendment's prohibition against cruel and unusual punishment; and (4) violates the Fifth Amendment's Double Jeopardy Clause. Plaintiffs sought a declaration that the Ordinance is unconstitutional on its face and as applied to them, a permanent injunction prohibiting the City from enforcing the Ordinance, compensatory damages, and reasonable attorney fees and costs.

The district court held that the Ordinance was unconstitutional both as applied and on its face, because it (1) violated the plaintiffs' right to freedom of association; (2) violated the right of excluded persons to freedom of movement in the form of their right to intrastate travel; and, (3) violated Au France's right to be free from double jeopardy. The district court enjoined enforcement of the Ordinance and awarded plaintiffs $38,500 in fees.

Subsequent to the district court's decision, the Ohio Supreme Court declared that the post-conviction portion of the Ordinance violated both the United States Constitution and the State of Ohio Constitution. *State v. Burnett*, 755 N.E.2d 857, 865-868 (Ohio 2001), *cert. denied*, 122 S.Ct. 1790 (2002). According to all but one Justice of the Ohio Supreme Court, the Ordinance impermissibly infringed on a convicted individual's due process right to intrastate travel, specifically, the right to "travel locally through public spaces and roadways" of the state. *Id.* at 865. The *Burnett* court also ruled that the Ordinance impermissibly exceeded the local

punishment of imprisonment," however, this factor, in my view, is not entitled to overwhelming weight.

To support their position that the second factor—the historical treatment of the sanction—is indicative of a criminal penalty, the plaintiffs contend that the ordinance effectively banished persons from Over the Rhine. The plaintiffs are correct that banishment has historically been regarded as a punishment. *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 474 (1977) (recognizing that banishment is a punishment commonly included as one of the "pains and penalties" proscribed by Article I, § 9 of the Constitution, which prohibits Bills of Attainder); *Mendoza-Martinez*, 372 U.S. at 169 n.23 (stating that "forfeiture of citizenship and the related devices of banishment and exile have throughout history been used as punishment").

Equating the ordinance's ninety-day and one-year exclusions with banishment, however, is problematic, because the ordinance provided for variances to individuals who reside in or who are employed by a lawful business located in an exclusion zone. Registered social service agencies, moreover, could grant variances to individuals whom they assist. As a result, I do not believe that the ordinance's temporary exclusions were equivalent to what has been historically recognized as a form of punishment. Furthermore, although both the plaintiffs and the district court considered the particular circumstances of Johnson and Au France, *Hudson* instructs that the inquiry should be limited to the face of the statute. *Hudson*, 522 U.S. at 100. The ordinance in question, when viewed as a whole, provided for the temporary exclusion of individuals who were arrested or convicted of a drug-related crime from designated high-crime neighborhoods, and it allowed for variances to prevent interference with such a person's residence, employment, or ability to obtain crucial social services. Under these circumstances, I conclude that this sanction did not constitute a penalty that "has historically been regarded as a punishment."

a drug-exclusion zone as a "civil exclusion." C.M.C. § 755-5. Furthermore, the ordinance provides that its purpose is to advance the City's interest in "restoring the quality of life and protecting the health, safety, and welfare of citizens using the public ways" in neighborhoods with high incidents of drug-related offenses. Cincinnati, Ohio, Ordinance No. 229-1996, § 1(D) (Aug. 7, 1996). We can therefore proceed to the second step in order to determine whether the plaintiffs meet the high burden necessary to establish that the ordinance in fact constituted a criminal penalty under the above-stated factors.

With regard to the first factor, the ordinance clearly limits the freedom of movement of persons arrested or convicted for drug-related offenses that occur in exclusion zones. The City relies upon *Hudson* for the proposition that excluding someone from a limited geographic area is not "an affirmative disability or restraint." In *Hudson*, the Supreme Court held that being barred from the banking profession is not a criminal penalty. *Hudson*, 522 U.S. at 105. The Court rejected the argument that the sanctions involved an "affirmative disability or restraint," noting that "[w]hile petitioners have been prohibited from further participating in the banking industry, this is certainly nothing approaching the infamous punishment of imprisonment." *Id*. at 104 (internal quotation marks omitted).

Contrary to the City's position, I do not believe that this language supports the conclusion that an "affirmative disability or restraint" occurs only where a person faces imprisonment or confinement. Instead, it simply recognizes that imprisonment is the clearest example of a restraint. The Supreme Court in *Mendoza-Martinez* and subsequent cases could have easily used the term "imprisonment" if it had intended to limit the first factor to that sanction. I therefore conclude that being banned from a drug-exclusion zone constitutes a form of restraint, albeit not of the most extreme type. The first factor thus provides a modicum of support for the plaintiffs' argument that the ordinance imposed a criminal penalty. Because the restraint is far from the "infamous

authority granted to the City by Section 3, Article XVIII of the Ohio Constitution. *Id.* at 868.

## II.

In light of the Ohio Supreme Court's recent decision in *Burnett*, we must first address whether an "actual controversy still exists between the parties." *WJW-TV, Inc. v. City of Cleveland*, 878 F.2d 906, 909 (6th Cir. 1989) (per curiam) (citations omitted); *see also CDI Info. Servs., Inc. v. Reno*, 278 F.3d 616, 618 (6th Cir. 2002) (noting this court's obligation to police its own jurisdiction). We recognized in *WJW-TV, Inc.* that an intervening state supreme court decision on a particular issue may render an appeal to this court on the same issue moot. *Id.* at 910; *see generally* 15 *Moore's Federal Practice* § 101.96 (3d ed. 1997). That the state court resolved the *WJW-TV* issue on state and municipal law grounds did not affect our conclusion. *Id.* (citing *Detroit Fire Fighters Ass'n, Local No. 344, I.A.F.F. v. Dixon*, 572 F.2d 557, 559 (6th Cir. 1978) (per curiam)).

While the *Burnett* court limited its constitutional analysis to the Ordinance's post-conviction exclusion, *Burnett*, 755 N.E.2d at 860 n.3, its state law holding appears to invalidate the entire Ordinance. *Id.* at 868 ("The ordinance, therefore, is invalid under section 3, Article XVIII of the Ohio Constitution."). Thus, *Burnett* could moot the present appeal. In this case, however, the parties still have an actual case or controversy with respect to the district court's award of attorney fees. *See United Ass'n of Journeymen v. Bechtel Constr. Co.*, 128 F.3d 1318, 1322 (9th Cir. 1997); *Washington Hosp. Ctr. v. Collier*, 947 F.2d 1498, 1502 (D.C. Cir. 1991). The plaintiffs are entitled to this award only if the Ordinance violated their federal rights; thus, we must evaluate their claim regarding the constitutionality of the Ordinance. 42 U.S.C. § 1988; *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405-06 (6th Cir. 2001).

Lastly, we note that the City's assurance that it no longer enforces the Ordinance, *see Burnett*, 755 N.E.2d at 860, does not render the present appeal moot. "[A] defendant's

voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Deja Vu of Nashville, Inc. v. Met. Gov't of Nashville*, 274 F.3d 377, 387 (6th Cir. 2001) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.E.2d 152 (1982)).

### III.

We review a district court's grant of summary judgment *de novo*. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed. 2d 114 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.E.2d 443 (1989)); *see also Montgomery v. Carter Cy.*, 226 F.3d 758, 769 (6th Cir. 2000); *Cf. United States v. Lanier*, 520 U.S. 259, 272 n.7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (cautioning that not "all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments"). Seeking to ground this dispute in an Amendment other than the Fourteenth Amendment, the City argues that the Fourth Amendment provides the exclusive analytical framework to assess the constitutionality of the Ordinance. According to the City, post-arrest or post-conviction exclusion from Over the Rhine's sidewalks, public walkways, and streets, constitutes, at most, a partial seizure to be evaluated under the rubric of Fourth Amendment reasonableness. We disagree.

establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Id*. (internal quotation marks omitted).

Even if the legislature indicates its desire to establish a civil penalty, a second step in the analysis is necessary. A court must determine "whether the statutory scheme was so punitive either in purpose or effect as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Id*. (internal quotation marks and citation omitted) (alternation in original). The Supreme Court has identified seven factors that "provide useful guideposts" for answering this question:

(1) [w]hether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of *scienter*; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned. *Id*. at 99-100 (alteration and italics in original) (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

Because these factors "may often point in differing directions," no single factor is dispositive. *Mendoza-Martinez*, 372 U.S. at 169 (1963). The Supreme Court has also determined that "these factors must be considered in relation to the statute on its face," not in connection with individuals affected by the allegedly civil penalty. *Id*. Finally, "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 100 (internal quotation marks omitted).

Neither party disputes that the ordinance was intended to be a civil remedy. The ordinance labels the restrictions that follow an arrest or conviction for a drug offense committed in

(applying rational basis review to a policy that limited individuals' mobility but did not affect fundamental rights or involve suspect classifications).

The majority recognizes that the City's goal of eradicating the blight of drug-infested neighborhoods constitutes a compelling governmental interest. (Maj. Op. at 29-30) This purpose in enacting the ordinance necessarily satisfies the more lenient test of being a legitimate interest. Moreover, preventing individuals who are arrested for or convicted of committing drug offenses in drug-exclusion zones from entering those neighborhoods is, in my view, rationally related to achieving the City's interest. *See Thompson*, 250 F.3d at 407 (concluding that banning individuals who have criminal histories from entering the public housing authority's premises was rationally related to the goal of suppressing and preventing crime on the premises). I am therefore of the opinion that the ordinance would have survived rational basis review.

### III.  DOUBLE JEOPARDY

The plaintiffs' final argument, which the majority had no reason to address, is that the ordinance violated the Double Jeopardy Clause of the Fifth Amendment. This clause "protects against successive prosecutions for the same offense after acquittal or conviction and against multiple criminal punishments for the same offense." *Monge v. California*, 524 U.S. 721, 727-28 (1998). According to the plaintiffs, the sanctions imposed by the ordinance are so punitive that they amount to extra-judicial punishment, rather than a remedial civil effort by the City to rehabilitate neighborhoods that experience disproportionately high rates of drug-abuse crimes.

Determining whether a particular punishment is criminal or civil for purposes of the Double Jeopardy Clause first requires an examination of the legislation that imposes the sanction at issue. *Hudson v. United States*, 522 U.S. 93, 99 (1997) ("Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction."). The first step in this inquiry is to determine "whether the legislature, in

Generally, the Fourth Amendment applies to "pretrial deprivations of liberty." *Albright*, 510 U.S. at 274. The Fourth Amendment plainly applies to investigatory stops and formal arrests, but does not apply post-conviction. *See Graham*, 490 U.S. at 395 n. 10; *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *see also Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) ("Which amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between."). Thus, there is simply no reasonable basis for the City's assertion that the Fourth Amendment provides the exclusive analytical framework to evaluate the post-conviction provision of the Ordinance.

Determining whether the Fourth Amendment provides the appropriate framework for evaluating the post-arrest provision of the Ordinance is a more difficult question. Beyond its general statement in *Albright*, the Supreme Court has not yet pinpointed the exact point along the pretrial continuum where the Fourth Amendment's protection gives way to the protection of another Amendment. *Graham*, 490 U.S. at 395 n. 10 (acknowledging that the Court has not yet "resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive force beyond the point at which arrest ends and pretrial detention begins"). And our sister circuits have reached different answers to this question. *Compare Reed v. City of Chicago*, 77 F.3d 1049, 1052 n.3 (7th Cir. 1996) *with Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997).

Concurring in *Albright*, Justice Ginsburg stated that a defendant who is released before trial "is scarcely at liberty." 510 U.S. at 279 (Ginsburg, J., concurring) According to Justice Ginsburg, such a defendant "remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to appear in court and answer the state's charges." *Id.*; *see also id.* at 307 (Stevens, J., dissenting) (noting his agreement with Justice Ginsburg's view that "the initial seizure of petitioner continued until his discharge."); *id.* at 290 (Souter, J., concurring) (noting that movement is

restrained when "seizure occurs or bond terms are imposed"); *Gerstein*, 420 U.S. at 114 ("Even pretrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty."); *Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 301, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984) (stating, in habeas corpus context, that one released on his or her own recognizance remains in official custody because he is "subject[ed] . . . to restraints not shared by the public generally" such as "an obligation to appear for trial . . . on the scheduled day and also at any subsequent time to which the case may be continued," and a "require[ment] that he not depart" from the jurisdiction "without leave" of the court) (internal quotation marks omitted). Justice Ginsburg explained:

> The purpose of an arrest at common law, in both criminal and civil cases, was "only to compel an appearance in court," and "that purpose is equally answered, whether the sheriff detains [the suspect's] person, or takes sufficient security for his appearance called bail." (citations omitted). The common law thus seems to have regarded the difference between pretrial incarceration and other ways to secure a defendant's court attendance as a distinction between methods of retaining control over a defendant's person, not one between seizure and its opposite.

*Id.　But see Riley v. Dorton*, 115 F.3d 1159, 1163 (4th Cir. 1997) (en banc) (rejecting "continuing seizure" doctrine); *Reed*, 77 F.3d at 1052 n.3 (same).

In a series of malicious prosecution cases, some of our sister circuits – relying primarily on Justice Ginsburg's *Albright* concurrence – have ruled that certain pre-trial detention conditions implicate the Fourth Amendment's prohibition on unreasonable seizures. For example, the Second Circuit held that a judicial order prohibiting the defendant from leaving the state, combined with a directive to attend court appointments, constituted a seizure. *Murphy*, 118 F.3d at 946. Characterizing it as a "close question," the

childbirth, the raising and education of children, and cohabitation with one's relatives." *Id*. (citations omitted).

Although the attorney-client relationship shares many of the characteristics of families, including "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship," I reject the notion that these traits alone are sufficient to justify finding that "freedom of association as an intrinsic element of personal liberty" attaches to the attorney-client relationship. *Id*. at 620. Neither a client nor an attorney are typically seeking "emotional enrichment" from their association. Nor does the relationship contribute to a client's ability to define his or her identity. Furthermore, the tie between an attorney and his or her client does not represent the "kinds of personal bonds [that] have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs . . . ." *Id*. at 618-19.

The preceding analysis of the attorney-client relationship is even more applicable to associations between individuals and charitable organizations. Although a recipient and the provider of social services may develop close ties, the relationship is by no means necessarily one of intimacy. Emotional enrichment and self-development, moreover, are not the primary goals or products of these associations.

For all of these reasons, I conclude that the ordinance did not interfere with Au France's Fourteenth Amendment right to freedom of association.

## II.  RATIONAL BASIS REVIEW

In addition to not infringing upon the plaintiffs' fundamental rights, the ordinance did not involve any suspect classifications. As a result, the ordinance is constitutional so long as it is "rationally related to legitimate government interests." *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997) (explaining the applicable standard for reviewing a law that does not involve a fundamental liberty interest); *Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir. 2001)

could meet outside Over the Rhine, communicate on the telephone, and correspond through the mail. Johnson could therefore continue to participate in the upbringing of her grandchildren, the very right that the majority identifies as the fundamental associational right at issue in the present case. The fact that such participation became less convenient during her exclusion is not a factor in determining whether Johnson's asserted right is a fundamental liberty interest.

As for Au France, he contends that the right "to enter into and maintain certain intimate human relationships," *Roberts v. United States Jaycees*, 468 U.S. 609, 617 (1984), protects his right to associate with his chosen attorney and with supportive persons and organizations in Over the Rhine. The majority find this argument persuasive. I disagree.

In *Roberts*, the Supreme Court held that a state law requiring the Jaycees to accept women as members did not violate the male members' constitutional rights of free speech and association. *Id*. at 623-29. Although the law infringed on the members' right of expressive association, the Court concluded that the state offered compelling interests to justify the interference and that the law was the least restrictive means for achieving those goals. *Id*. The Court also held that the law did not infringe on the members' freedom of intimate association, because the Jaycees lacked the characteristics necessary for this type of constitutional protection to apply. *Id*. at 620-21. As the Court explained, the reason for recognizing a constitutional right to form certain intimate relationships is that they provide "emotional enrichment" to the lives of the persons involved. *Id*. at 619 ("[T]he constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others."). "Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty." *Id*. The examples of such intimate relationships given by the Court "are those that attend the creation and sustenance of a family—marriage,

Third Circuit similarly ruled that pretrial interstate travel restrictions and mandatory court attendance constituted a seizure. *Gallo v. City of Philadelphia,* 161 F.3d 217, 222 (3d Cir. 1998); *see also Evans v. Ball*, 168 F.3d 856, 861 (5th Cir. 1999) (ruling that a "summons to appear in court, coupled with the requirements that [the defendant] obtain permission before leaving the state, report regularly to pretrial services, sign a personal recognizance bond, and provide federal officers with financial and identifying information, diminished [the defendant's] liberty enough to render him seized"); *cf. Nieves v. McSweeney*, 241 F.3d 46, 56-57 (1st Cir. 2001) (holding that defendant's obligation to appear in court did not constitute a seizure); *Britton v. Maloney*, 196 F.3d 24, 29-30 (1st Cir. 1999) (ruling that issuance of a summons did not constitute a seizure).

We have held that a Fourth Amendment seizure "continues throughout the time the person remains in the custody of the arresting officers," *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988), but we have not yet addressed whether the seizure could continue past this point. And, while we have held that the issuance of a traffic ticket did not, standing alone, constitute a seizure, *DePiero v. City of Macedonia*, 180 F.3d 770, 789 (6th Cir. 1999), we have not yet explicitly addressed the "continuing seizure" doctrine advanced by Justice Ginsburg. *See Fox v. Van Oosterum*, 176 F.3d 342, 351 & n.7 (6th Cir. 1999); *cf. Phelps*, 286 F.3d at 300 (interpreting *McDowell* as endorsing the "continuing seizure" doctrine). We need not resolve this question in the present case because, even assuming the validity of the "continuing seizure" doctrine, we do not believe that the Fourth Amendment provides the appropriate framework to analyze the Ordinance.

To be sure, application of the Ordinance's post-arrest provision resembles a seizure in that it is a show of government authority and a restraint on a freedom of movement. *See United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.E.2d 497 (1980) ("We adhere to the view that a person is 'seized' only when, by means of physical

force or a show of authority, his freedom of movement is restrained."). But in each of the cases addressed by our sister circuits, the government not only curtailed the suspect's right to interstate travel, it also imposed additional restrictions designed to compel an ultimate court appearance, such as obligations to post bond, attend court hearings, and contact pretrial services. *Evans*, 168 F.3d at 861; *Gallo*, 161 F.2d at 222; *Murphy*, 118 F.3d at 946. In contrast, (1) the Ordinance imposes solely travel restrictions; (2) the ninety day exclusion is not bounded by an eventual court appearance; and, (3) the stated purpose of these restrictions is to combat drug crime in Over the Rhine. Thus, we conclude that the Fourth Amendment's prohibition against unreasonable seizures does not provide the appropriate analytical framework for evaluating the constitutionality of such restrictions. Therefore, we turn to the more general protections of due process. *See Phelps*, 286 F.3d at 300 ("[I]f plaintiff is not in a situation where his rights are governed by the particular provision of the Fourth or Eight Amendment, the more generally applicable provisions of the due process clause still provides the individual some protection against physical abuse by officials.").

IV.

Plaintiffs argue that the Ordinance violates their asserted right to freedom of movement and intrastate travel because it excludes arrested and convicted individuals from Over the Rhine for ninety days and one year, respectively.

A.

At the outset, we must ascertain whether another panel of this court has already addressed whether the Constitution protects a right to intrastate travel. In answering this question, we address three cases that touch on the question of whether the Constitution protects a right of intrastate travel – *Wardwell v. Board of Education of the City of Cincinnati*, 529 F.2d 625 (6th Cir. 1976)*, Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516 (6th Cir. 1997), and *Thompson v. Ashe*, 250 F.3d 399 (6th Cir. 2001). Of course, without an

education and rearing, we would be bound by the holding in *Thompson v Ashe*, 250 F.3d 399, 407 (6th Cir. 2001), that "Thompson has no fundamental right to visit his family members on [the public housing authority's] property." (Maj. Op. at 26-27) But the majority nevertheless concludes that Johnson has a fundamental right to visit her grandchildren in order to assist in their upbringing.

In support of its position, the majority relies upon both *Moore* and a series of Supreme Court cases recognizing that *parents or guardians* have a fundamental right "to direct the education and upbringing of one's children." *Glucksberg*, 521 U.S. at 720; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (recognizing that "[c]hoices about . . . the upbringing of children are among associational rights this Court has ranked as of basic importance in our society") (internal quotation marks omitted). None of the pertinent Supreme Court cases, however, involve the right of *nonresident grandparents* to contribute to the raising of their grandchildren. *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925) (holding that Oregon's requirement that all children between the ages of 8 and 16 attend public schools "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control"); *Meyer v. Nebraska*, 262 U.S. 390, 400-01 (1923) (holding that a Nebraska statute restricting the instruction of foreign languages violated the fundamental right of parents to engage a teacher to instruct their children in those languages). *Moore*, as noted above, focused on the possibility that grandparents who live with their grandchildren might assist in raising them, but it did not address the rights of a nonresident grandparent.

Johnson neither lived with nor acted as the guardian of her grandchildren. The relationship that she had with her grandchildren is therefore distinguishable from the situations that actually existed or were contemplated in *Moore*, *Pierce*, *Meyer*, and the other cases upon which the majority relies. Moreover, nothing in the ordinance prevented Johnson from maintaining continuing contact with her grandchildren. They

Unlike the present case, *Troxel* involved a conflict between the desires of the parent and those of the grandparents. The plurality opinion nonetheless implicitly questions whether grandparents have a fundamental liberty interest in being able to visit their grandchildren. To be sure, the lack of any discussion of the grandparents' interest may be due to the holding that the trial judge unconstitutionally infringed on the mother's right to raise her children by refusing to give the mother's interest any special weight. *Id*. at 72. But the fact that grandparents were seeking visitation rights, combined with the Court's analysis of the statute as applied to the case before it, accentuates the absence of even a passing acknowledgment of any fundamental right that grandparents might have to visit their grandchildren. I therefore believe that *Troxel* not only distinguishes between the rights of a parent as opposed to a grandparent to raise children and grandchildren, but also casts serious doubt on Johnson's asserted liberty interest.

For these reasons, I conclude that nonresident grandparents lack a fundamental legal right to visit their grandchildren. In reaching this conclusion, I recognize the valuable role that grandparents often play in the lives of their grandchildren. But parents retain the fundamental right to raise their own children. Where grandparents reside with their grandchildren, as was the case in *Moore*, the circumstances are such that recognizing the grandparents' right to live in that household is a logical outgrowth of relevant Supreme Court precedent. Recognizing the right to visit grandchildren as a fundamental liberty interest, in contrast, represents an expansion of previously recognized fundamental rights and presents the risk of imposing this court's policy preferences in the guise of the Due Process Clause. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

The preceding discussion explains why I believe that noncustodial grandparents lack a fundamental legal right to visit their grandchildren. Agreeing with this principle, the majority recognizes that if the issue were a purported right to visit grandchildren rather than a right to participate in their

intervening Supreme Court case or a controlling en banc decision, such a holding would be binding on the present panel. *Darrah v. City of Oak Park*, 255 F.3d 301, 309-10 (6th Cir. 2001); 6th Cir. R. 206(c). This rule does not, however, extend to dicta. *United States v. Jenkins*, 4 F.3d 1338, 1345 n. 8 (6th Cir. 1993); *Stockler v. Garratt*, 893 F.2d 856, 859 n.2 (6th Cir. 1990). Thus, we examine our three prior decisions to determine whether another panel has already addressed the question of whether the Constitution protects a right to intrastate travel.

In *Wardwell*, the plaintiff argued that the Cincinnati school board's continuing residency requirement infringed on his constitutionally protected right to travel as defined in *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.E.2d 600 (1969), and *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). 529 F.2d at 627. Although those cases involved only interstate travel, plaintiff argued that they also applied to intrastate travel. *Id.* This court rejected plaintiff's argument, explaining that: "We find no support for plaintiff's theory that the right to intrastate travel has been afforded federal constitutional protection." After reviewing *Shapiro*, *Dunn* and *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.E.2d 306 (1974), all of which involved residency requirements, the court added that "the aspect of the right to travel with which the Court was concerned in those cases is not involved here." *Id.* Applying rational basis review, the court upheld the school board's continuing residency requirement. *Id*. at 628.

Initially, we are satisfied that *Wardwell*'s holding – that the Cincinnati school board's continuing residency requirement did not implicate due process protections – does not foreclose plaintiffs' intrastate travel claim. At its simplest, this case does not involve a continuing residency requirement, it involves a constitutional challenge to an ordinance that excludes certain individuals from specified high crime areas of the City of Cincinnati, and presents issues of access not raised in *Wardwell*.

*Wardwell* also stated that "*Shapiro* and the other right to travel cases are not applicable to intrastate travel and *continuing* employee residency requirements." *Id.* (emphasis in original). One judge of the Ohio Supreme Court read this language to reject any constitutional right to intrastate travel in this circuit. *See Burnett*, 755 N.E.2d at 873 (Cook, J., concurring). Upon inspection, however, this statement does not foreclose a constitutional right to intrastate travel. Rather, *Wardwell*'s statement stands for two propositions, neither of which is implicated by the Ordinance: 1) the Supreme Court's interstate travel holdings applied only to interstate travel; and (2) the Supreme Court's interstate travel cases did not prohibit a school district's residency requirement. Thus, in *Kuhnle Brothers, Inc.*, the panel stated that the question of whether the Constitution protects any right of intrastate travel remained an open question in this circuit. 103 F.3d at 522. ("If such liberty interests [in a fundamental constitutional right to intrastate travel] do in fact exist in this case – a question that will have to be decided on remand because it is not before us and we express no opinion on it . . . .").

The dissent argues that *Wardwell* held that the "rational-basis test applies to determine the constitutionality of a law affecting intrastate travel." But the statement that the dissent relies on does not extend this far: "On the other hand, where, as in the present case, a *continuing* employee residency requirement affecting at most the right of intrastate travel is involved, the 'rational basis' test is the touchstone to determine its validity." *Id.* at 628 (emphasis in original). While this statement establishes that continuing employee residency requirements are evaluated under the rational basis test, it does not hold that the rational basis test governs every impairment of an asserted right to intrastate travel. One could infer that the *Wardwell* panel was suggesting that the rational basis test should govern all potential intrastate travel claims, but considered in context of the rest of the opinion, such an inference is not compulsory. Even if such an inference was the only reasonable inference, it would be dicta and would not bind this court. *See Jenkins*, 4 F.3d at 1345 n. 8.

expressed a reluctance to extend it beyond grandparents living with their grandchildren. *See Brown v. Ives*, 129 F.3d 209, 211 (1st Cir. 1997) (noting that cases raising the possibility of grandparents having "some constitutionally protected rights in relation to their association with their grandchildren" involve grandparents residing with their grandchildren, and that the rights of nonresident grandparents "have an even slimmer pedigree in the case law"); *Watterson v.* Pape, 987 F.2d 1, 8 n.6 (1st Cir. 1993) (recognizing that "the scope and level of constitutional protection for the liberty interests of grandparents probably differs from that for parents' interests," but holding that grandparents who reside with their grandchildren have "interests at least sufficient to avoid dismissal of their § 1983 claims on grounds they have no constitutionally protected right at stake"); *Ellis v. Hamilton*, 669 F.2d 510, 513 (7th Cir. 1982) (holding that a grandmother had due process rights in associating with her grandchildren where she acted *in loco parentis* to the children, claimed to have formal custody of the children when the defendants took them from her, and was "a great-aunt, an adoptive grandmother, and a *de facto* mother and father all rolled up into one") (italics in original).

Moreover, in *Troxel v. Granville*, 530 U.S. 57 (2000), a plurality of the Supreme Court held that, as applied to the facts before it, a state law permitting "[a]ny person" to petition a state court for the right to visit a child, and authorizing the court to grant such rights whenever "visitation may serve the best interest of the child," unconstitutionally interfered with the fundamental right of a mother to raise her own children. *Id*. at 60, 75. *Troxel* involved the state court's decision to allow grandparents visitation rights that exceeded the parent's preference. *Id*. at 71. Although the Court acknowledged the potential desirability of parents fostering strong relationships between grandparents and their grandchildren, it emphasized that "the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance." *Id*. at 70.

family, and defined "family" in such a manner that prevented a grandmother from living with her grandchildren, violated the grandmother's fundamental liberty interest in being able to live with them. *Id*. at 505-06. The plaintiff in *Moore* was a grandmother who lived with her son and two grandsons. Only one of the grandsons was the child of the son living in the house; the other was the child of the son's sibling. This living arrangement violated the city's housing ordinance. *Id*. at 496-97.

Throughout the plurality opinion in *Moore*, the Court emphasized the family and family living arrangements, not the rights of a grandparent to visit grandchildren. *See Ellis v. Hamilton*, 669 F.2d 510, 513 (7th Cir. 1982) (concluding that the Court in *Moore* "was concerned with the impact on the family unit as a whole—that is, with the interests of the child as well as of the grandparent"). In explaining why rational-basis review was not appropriate, for instance, the Court noted that the ordinance "selects certain categories of relatives who may live together and declares that others may not," thereby "slicing deeply into the family itself," and that it "intrudes on choices concerning *family living arrangements*." *Moore*, 431 U.S. at 498-99 (emphasis added).

The Court in *Moore* also framed the contours of the liberty interest at issue before it by emphasizing that "[t]he tradition of uncles, aunts, cousins, and especially grandparents *sharing a household* along with parents and children has roots equally venerable and equally deserving of constitutional recognition as those of the nuclear family." *Id*. at 504 (emphasis added). Finally, the Court recognized that "[d]ecisions concerning child rearing, which *Yoder*, *Meyer*, *Pierce* and other cases have recognized as entitled to constitutional protection, long have been shared with grandparents or other relatives *who occupy the same household*—indeed who may take on major responsibility for the rearing of the children." *Id*. at 505 (emphasis added).

The federal courts of appeals that have considered the contours of the liberty interest recognized in *Moore* have

Finally, in *Thompson*, this court addressed a challenge to a Tennessee statute prohibiting individuals suspected of having been involved in "drug activities or violent criminal activities" from trespassing in twelve Knoxville housing developments. 250 F.3d at 403. Although the plaintiff, Thompson, argued the statute violated a number of his constitutional rights, he did not present a right to travel claim to either the district or appellate court. The closest Thompson came to raising an intrastate travel claim was a passing reference to "freedom of movement" in his appellate brief. But Thompson offered no explanation or elaboration of this right, and the cases he cited in support of this purported "freedom of movement" concerned an Eighth Amendment challenge to corporal punishment, *Ingraham v. Wright*, 430 U.S. 651 (1977), a freedom of association challenge, *Roberts v. Jaycees*, 468 U.S. 609 (1984), and a challenge to a government contract bidding process, *see United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31 (6th Cir. 1992). As a result, the panel rejected Thompson's argument as "without merit," and added that "to the extent that Thompson refers to the 'right to travel,' as recognized by our jurisprudence, that right is essentially a right of interstate travel." *See Thompson*, 250 F.3d at 406. In the panel's two paragraph disposal of Thompson's "freedom of movement" mention, the panel cited only the Supreme Court's most recent interstate travel case, *Saenz v. Roe*, 526 U.S. 489 (1999), and did not discuss whether the Constitution protects a limited right of intrastate travel. *Id.*

Given that Thompson never asserted a right to intrastate travel, we cannot find that the *Thompson* court held that the Constitution does not protect any right of intrastate travel. Moreover, even if we were to analyze the panel's statement, we find that it says only that neither this court nor the Supreme Court has formally recognized a limited right to intrastate travel. While we have no quarrel with this statement of law, we emphasize that such a statement is quite apart from saying that this court or the Supreme Court has rejected a right to intrastate travel. Under these

circumstances, we conclude that the existence of a right to intrastate travel remains an open question in this circuit.

## B.

In analyzing whether a particular right implicates the protection of the Due Process Clause, we first carefully define the asserted right and then ask whether it is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.E.2d 772 (1993) (internal quotation marks and citations omitted); *see also Michael H. v. Gerald D.*, 491 U.S. 110, 122, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). Given these instructions, we believe the relevant, asserted right implicated by this case is a right to travel locally through public spaces and roadways. *See Lutz*, 899 F.2d 255, 268 (3d Cir. 1990) ("The right or tradition we consider may be described as the right to travel locally through public spaces and roadways.") While the terms are often used interchangeably, we do not use the right to travel locally through public spaces and roadways synonymously with a right to freedom of movement. To be sure, a right to freedom of movement could encompass a right to localized travel, but it could also include interstate and international travel components. While we draw from historical sources discussing a freedom of movement, and find their authority instructive, our holding is limited to the right to travel locally through public spaces and roadways. Moreover, while we can conceive of different articulations of a right to intrastate travel, the right we address – the right to travel locally through public spaces and roadways – is fundamentally one of access.

## C.

"The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." *United States v. Guest*, 383 U.S. 745, 757, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); *see also*

*Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984). The Court proceeded to observe that the relationships that most clearly merit protection under the Fourteenth Amendment "are those that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Id*. at 619 (citations omitted). These relationships, the Court noted, involve unique characteristics that distinguish them from other forms of association:

> Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationships.

*Id*. at 619-20.

The record, as the majority notes, establishes that Johnson helped care for her grandchildren and regularly took two of them to school. Because her grandchildren lived in Over the Rhine, however, Johnson was unable to continue these activities after receiving her exclusion notice. Johnson could have obtained a variance if she had been able to establish that she resided with her children in Over the Rhine, but she never applied for such a variance.

Confronted with these facts, the majority concludes that Johnson has "a fundamental freedom of association right to participate in the upbringing of her grandchildren." (Maj. Op. at 27) I disagree. The key Supreme Court case of *Moore v. City of East Cleveland*, 431 U.S. 494 (1977), in my view, not only fails to support Johnson's asserted associational right, but also suggests that no such right exists. In *Moore*, a plurality of the Supreme Court held that a city ordinance that limited occupancy of single dwelling units to members of one

Supreme Court, moreover, has noted that the First Amendment interest at stake in cases such as *Brotherhood of Railroad Trainmen* "was primarily the right to associate collectively for the common good." *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 335 (1985).

Even if the First Amendment were deemed to protect a person's right to associate with a particular attorney, I would find that the ordinance did not infringe upon that right. Au France, for example, was free to meet with his attorney, Bernard Wong, away from Wong's office, speak with Wong on the telephone, and communicate with Wong through the mail. The majority expresses the view that such possibilities are meaningless for a homeless man who has no telephone or permanent address. But I believe that it stretches credulity to find that Wong and Au France would have been unable to meet at a coffee shop, a bookstore, or a public library convenient to both of them.

For all of these reasons, I conclude that the ordinance did not interfere with any First Amendment right that Au France might have to associate with a particular attorney.

### 2. *Fundamental liberty interest in maintaining intimate personal relationships*

The plaintiffs' assertion that the ordinance infringed upon their fundamental right to form and maintain basic, intimate personal relationships has its foundation in the importance of these relationships in the nation's democratic system of government. As the Supreme Court has explained,

> choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty.

*Saenz*, 526 U.S. at 498 (describing the constitutional right to travel as "firmly embedded" in the Supreme Court's jurisprudence). It is "assertable against private interference as well as government action . . . . a virtually unconditional personal right, guaranteed by the Constitution to us all." *Shapiro*, 394 U.S. at 643 (Stewart, J., concurring). The right to interstate travel embraces three different components: (1) "the right of a citizen of one State to enter and to leave another state"; (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State"; and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz*, 526 U.S. at 500. The Supreme Court has not yet identified the source of the first travel right, but the latter two components are expressly protected by the Privileges and Immunities Clause. *Id.* at 501-03.

The Supreme Court has not yet addressed whether the Constitution also protects a right to intrastate travel. *Mem'l Hosp.*, 415 U.S. at 255-56. Both the district court in this case, 119 F. Supp. 2d. at 745-46, and the Ohio Supreme Court in *Burnett,* 755 N.E.2d at 865-66, recognized a limited constitutional right to intrastate travel and concluded that the Ordinance impermissibly infringed on this right. *See also Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990) (recognizing that the Constitution "protects the right to travel freely within a single state"); *Lutz*, 899 F.2d at 268 (holding that "the right to move freely about one's own neighborhood or town" is a fundamental liberty interest protected by the Due Process Clause); *Hutchins v. District of Columbia*, 188 F.3d 531, 561-62 (D.C. Cir. 1999) (Rogers, J., dissenting in part, concurring in part, joined by Tatel and Wald, JJ.) ("[P]recedents recognize a fundamental right to walk through public streets without thereby subjecting oneself to police custody."); *see also id.* at 538 (plurality) (Silberman, J.) (accepting that a "draconian curfew" might implicate substantive due process); *Pottinger v. City of Miami*, 810 F.

Supp. 1551, 1578-81 (S.D. Fla. 1992)[2]; *City of Seattle v. McConahy*, 937 P.2d 1133, 1141 (Wash. App. 1997).[3]

Although the Supreme Court has not expressly recognized a fundamental right to intrastate travel, as early as the Articles of Confederation, state citizens "possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom." *United States v. Wheeler*, 254 U.S. 281, 293, 41 S.Ct. 133, 65 L.E. 270 (1920). As Chief Justice Taney observed:

> For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and as members of the same community, must have the right to pass and repass through every part of it without interruption, *as freely as in our own States.*

---

[2] *But see Wright v. City of Jackson*, 506 F.2d 900, 902-03 (5th Cir. 1975).

[3] A number of state courts have also ruled that their respective state constitutions protect a right to intrastate travel. *See Watt v. Watt*, 971 P.2d 608, 615 (Wyo. 1999) ("The right to travel freely throughout the state is a necessary and fundamental aspect of our emancipated society, and it is retained by the citizens."); *Brandmiller v. Arreola*, 544 N.W.2d 894, 899 (Wisc. 1996) ("[W]e recognize that the right to travel intrastate is fundamental among the liberties preserved by the Wisconsin Constitution. This right to travel includes the right to move freely about one's neighborhood, even in an automobile."); *State v. Shigematsu*, 483 P.2d 997, 1001 (Haw. 1971) (recognizing right to freedom of movement, which "include[s] the right of men to move from place to place, to walk in the fields in the country or on the streets of a city, [and] to stand under open sky."); *State v. Cuypers*, 559 N.W.2d 435, 437 (Minn. App. 1997) ("Minnesota also recognizes the right to intrastate travel."); *City of New York v. Andrews*, 719 N.Y.S.2d 442, 452 (N.Y. Sup. Ct. 2000) ("There can be no doubt that our State Constitution, no less than the Federal Constitution, supports the right to travel freely within the State."); *see also City of Bismark v. Stuart*, 546 N.W.2d 366, 367 (N.D. 1996) (implying existence of right).

assembly, petition for the redress of grievances, and the exercise of religion"). The thrust of the plaintiffs' freedom-of-association challenge—that the ordinance interfered with their abilities to maintain interpersonal relationships—does not relate to these First Amendment rights. As a result, I am of the opinion that the First Amendment does not provide protection for participating in the relationships sought by the plaintiffs.

In reaching this conclusion, I recognize that Au France's inability to visit his attorney's office during his exclusion from Over the Rhine presents a closer question. Au France seeks to derive from the First Amendment a right to associate with the particular attorney of his choice in order to challenge the alleged violations of his legal rights. Although this asserted right is related to Au France's desire to "petition the Government for a redress of grievances," U.S. Const. amend. I, the pertinent Supreme Court cases addressing the interplay between the First Amendment's guarantees and the right to meet with an attorney all deal with the rights of organizations and their members. *See, e.g., United Mine Workers of Am. v. Illinois State Bar Ass'n*, 389 U.S. 217, 221-22 (1967) (holding that the union's members had a First Amendment right to hire an attorney collectively to assist them in asserting their legal claims); *Bhd. of R.R. Trainmen v. Virginia, ex rel. Virginia State Bar*, 377 U.S. 1, 8 (1964) (holding that the First Amendment protected the Brotherhood's right to maintain a Department of Legal Counsel that referred the Brotherhood's members and their families to attorneys); *NAACP v. Button*, 371 U.S. 415, 428-29 (1963) (holding that the First Amendment protected the right of the NAACP to recommend attorneys to prospective litigants seeking legal redress for the alleged violations of their rights).

None of these cases support the recognition of a First Amendment right to associate with a particular attorney. Rather, *United Mine Workers* dealt with a prohibition against collectively hiring an attorney, and both *Brotherhood of Railroad Trainmen* and *Button* involved laws proscribing particular methods of referring clients to attorneys. The

movement in intrastate travel. As a result, I respectfully disagree with the majority's conclusion that the right to intrastate travel is a fundamental liberty interest entitled to heightened constitutional protection.

## B.   Freedom of association

Both plaintiffs also claim that the ordinance infringed upon their freedom of association, allegedly because it interfered with their abilities to maintain intimate, interpersonal relationships. Johnson contends that, as a grandmother, she has a right to visit and assist in the raising of her grandchildren. Au France, on the other hand, claims that the ordinance interfered with his right to associate with the attorney of his choice and to meet with charitable organizations that help provide for his essential needs. The plaintiffs seek to derive these rights from the First Amendment's guarantee of freedom of association and from the substantive component of the Due Process Clause of the Fourteenth Amendment.

Unlike the majority, I do not believe that the ordinance interfered with the plaintiffs' freedom of *intimate association*, a right that is protected by the Due Process Clause. The majority does not address whether the ordinance infringed upon the plaintiffs' freedom of *expressive association*, a right protected by the First Amendment. Nevertheless, because the plaintiffs mention both the First and the Fourteenth Amendments in their complaint, I will consider below each potential source of constitutionally protected associational rights.

### 1.   *First Amendment right to freedom of association*

Although the plaintiffs' complaint alleges that the ordinance interfered with their interpersonal relationships, the freedom of association guaranteed by the First Amendment has a more narrow focus. *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984) (noting that "the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech,

*Smith v. Turner*, 48 U.S. (7 How.) 283, 492, 12 L.Ed. 702, 790 (1849) (Taney, C.J., dissenting) (emphasis added); *see also Civil Rights Cases*, 109 U.S. 3, 39, 3 S.Ct. 18, 27 L.E.2d 835 (1883) (Harlan, J., dissenting) (noting that "personal liberty consists, says Blackstone, in the power of locomotion, of changing situation, or removing one's person to whatever place one's own inclination may direct, without restraint, unless by due course of law") (internal quotations omitted). Or as the Supreme Court noted at the turn of the twentieth century: "[T]he right to remove from one place to another according to inclination, is an attribute of . . . liberty . . . secured by the Fourteenth Amendment and by other provisions of the Constitution." *Williams v. Fears*, 179 U.S. 270, 274, 21 S.Ct. 128 (1900). More recently, Justice Stevens, joined by Justice Souter and Justice Ginsburg, observed:

> [I]t is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is "a part of our heritage" *Kent v. Dulles*, 337 U.S. 116, 126, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), or the right to move "to whatsoever place one's own inclination may direct" identified in Blackstone's Commentaries. 1 W. Blackstone, Commentaries on the Laws of England 130 (1765).

*City of Chicago v. Morales*, 527 U.S. 41, 54, 119 S.Ct. 1849, 144 L.E.2d 67 (1999); *see also Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (noting that anti-loitering statute, which required individuals to provide "credible and reliable" identification, "implicated consideration of the constitutional right to freedom of movement"); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 164, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (describing walking, loitering, and wandering as "historically part of the amenities of life as we have known them."); *Guest*, 383 U.S. at 759 ("[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution."); *Nunez v. City of San Diego*, 114 F.3d 935,

944 (9th Cir. 1997) ("Citizens have a fundamental right of free movement, 'historically part of the amenities of life as we have known them.'") (citation omitted); *Burnett*, 755 N.E.2d at 865 ("This freedom of mobility is a tradition extending back to when the first settler crossed into what would eventually become this great state, and it is a tradition no Ohioan would freely relinquish."); *Gomez v. Turner*, 672 F.2d 134, 143-44 n. 18 (D.C. Cir. 1982) (noting that the ability to "walk the streets, without explanation or formal papers is surely among the cherished liberties that distinguish this nation from so many others.").[4]   In light of these cases, we find that the right to travel locally through public spaces and roadways enjoys a unique and protected place in our national heritage.

In addition to its solid historical foundation, the tremendous practical significance of a right to localized travel also strongly suggests that such a right is secured by substantive due process.  The right to travel locally through public spaces and roadways – perhaps more than any other right secured by substantive due process – is an everyday right, a right we depend on to carry out our daily life activities.  It is, at its core, a right of function.  In the words of Justice Douglas:

---

[4] Writing in 1971, the Second Circuit keenly observed that "[i]t would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971); *see also Burnett*, 755 N.E.2d at 865("Without the one, there would never be the other.").   While we credit this observation, we cannot rely on this proposition because recent Supreme Court cases demonstrate that the Court has not yet definitely located the textual source of the right to interstate travel. *Lutz*,  899 F.2d at 261.  As the Third Circuit noted: "One consequence of the Court's refusal in *Shapiro* and its progeny to ground the right to travel in particular constitutional text is that there exists some uncertainty as to whether it is, in fact, 'a fundamental precept of personal liberty.'" *Id.*  Of course, if the right to interstate travel is, in fact, grounded in substantive due process, the Second Circuit's point is "unimpeachable." *Id.*

Instead, I believe that *Wardwell*'s holding that the rational-basis test applies to determine the constitutionality of a law affecting intrastate travel is necessarily based upon the conclusion that only the right to interstate travel, not the ability to travel within a single state, is a fundamental liberty interest entitled to heightened constitutional protection. *See Hutchins v. Dist. of Columbia*, 188 F.3d 531, 537-38 (D.C. Cir. 1999) (en banc) (citing *Wardwell* for the proposition that the Sixth Circuit has rejected a fundamental right to intrastate travel).  If the right to intrastate travel had been a fundamental liberty interest, this court would have been required to apply strict scrutiny, rather than the rational-basis standard of review that was in fact used, to evaluate the constitutionality of the residency requirement.

The majority acknowledges that "a prior published opinion of this court is binding unless either an intervening decision of the United States Supreme Court requires modification of the prior opinion or it is overruled by this court sitting en banc." *United States v. Roper*, 266 F.3d 526, 530 (6th Cir. 2001).  Neither of these events has occurred since *Wardwell* was decided.  I therefore believe that *Wardwell* prohibits us from reconsidering the issue of whether the right to intrastate travel, or the "right to travel locally through public spaces and roadways" as it is phrased by the majority, is a fundamental liberty interest.  Moreover, where a subsequent opinion from this court conflicts with an older one, the earlier decision remains the binding precedent. *Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001) ("[W]hen a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case.").  This rule requires us to adhere to *Wardwell*, even if the court in *Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516, 521-22 (6th Cir. 1997), believed (erroneously in my opinion) that the question of whether the right to intrastate travel is entitled to heightened constitutional protection was still unresolved in this circuit.

*Wardwell* thus refutes the plaintiffs' argument that the ordinance infringed upon a fundamental right to freedom of

*Id*. at 276-77 (alteration and emphasis in original). This language strongly suggests that no fundamental right to intrastate travel exists.

After acknowledging that the Supreme Court has not explicitly recognized a right to intrastate travel, the majority concludes that the "right to travel locally through public spaces and roadways" is a fundamental liberty interest. (Maj. Op. at 21) Unlike the majority, however, I believe that this court's opinion in *Wardwell v. Board of Education of Cincinnati*, 529 F. 2d 625 (6th Cir. 1976), held that the right to intrastate travel is not entitled to heightened constitutional protection.

The plaintiff in *Wardwell* challenged the constitutionality of the Board of Education's rule that required all teachers in the Cincinnati school system to reside within the city school district. *Id*. at 626. Wardwell argued that the residency requirement infringed upon his right to intrastate travel. *Id*. at 627. This court rejected his argument, concluding that the relevant Supreme Court decisions had dealt only with interstate travel. *Id*. ("We find no support for plaintiff's theory that the right to intrastate travel has been afforded federal constitutional protection."). Equally important, this court held that "where, as in the present case, a *continuing* employee residency requirement affecting at most the right of intrastate travel is involved, the 'rational basis' test is the touchstone to determine its validity." *Id*. at 628 (footnote omitted) (emphasis in original).

The majority in the present case interprets *Wardwell* to have established that the Supreme Court's travel holdings (1) "applied only to interstate travel" and (2) "did not prohibit a school district's residency requirement." (Maj. Op. at 14) I have no quarrel with the majority's analysis of *Wardwell*'s treatment of the relevant Supreme Court cases. But I disagree with the majority's conclusion that *Wardwell* did nothing more than determine that the Supreme Court's right-to-travel cases were not applicable to the residency requirement imposed by the Cincinnati Board of Education.

Freedom of movement, at home and abroad, is important for job and business opportunities – for cultural, political, and social activities – for all the commingling which gregarious man enjoys. Those with the right of free movement use it at times for mischievous purposes. But that is true of many liberties we enjoy. We nevertheless place our faith in them, and against restraint, knowing that the risk of abusing liberty so as to give rise to punishable conduct is part of the price we pay for this free society.

*Aptheker v. Secretary of State*, 378 U.S. 500, 519-20, 184 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (Douglas, J., concurring); *see also Hutchins*, 188 F.3d at 561 (Rogers, J.)(dissenting in part, concurring in part). The Ordinance itself references an individual's "significant private interest in being able to travel and associate freely in all areas of the City." In view of the historical endorsement of a right to intrastate travel and the practical necessity of such a right, we hold that the Constitution protects a right to travel locally through public spaces and roadways.

### V.

Plaintiffs argue that exclusion from Over the Rhine pursuant to the Ordinance infringes upon their constitutional right to freedom of association. Freedom of association is not an enumerated constitutional right, but arises as a necessary attendant to the Bill of Rights' protection of individual liberty interests. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617-618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

### A.

In *Roberts*, the Supreme Court identified two forms of constitutionally-protected associational rights: "freedom of intimate association" and "freedom of expressive association." *Id.* The freedom of intimate association, which is applicable to plaintiffs' claims here, stems from the necessity of protecting individuals' ability "to enter into and maintain certain intimate human relationships [that] must be

secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id.* Constitutionally protected intimate associations include those "personal bonds [that] have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs," and that "thereby foster diversity and act as critical buffers between the individual and the power of the State." *Id.* at 618-19.

Johnson claims that the Ordinance unconstitutionally infringes on her freedom of association right to participate in the upbringing of her grandchildren. Au France claims that the Ordinance unconstitutionally infringes on his freedom of association right to visit his attorney. Because both plaintiffs' claims involve intimate relationships that "foster diversity and act as critical buffers between the individual and the power of the State," we examine their claims under the freedom of intimate association framework articulated in *Roberts*.

### B.

Johnson's claim necessitates an examination of the reach of constitutionally protected familial association interests.

The Supreme Court has recognized that some of the most important personal bonds necessary for the protection of individual freedom "are those that attend the creation and sustenance of a family – [including] the upbringing and education of children." *Roberts*, 468 U.S. at 619 (citing *Smith v. Org. of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977)). Accordingly, the Supreme Court has consistently recognized associational rights involving private family life as worthy of special constitutional protection. *See Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1976) ("A host of cases . . . have consistently acknowledged a 'private realm of family life which the state cannot enter.'") (plurality opinion) (quoting

The "right to travel" discussed in our cases embraces at least three different components. It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

*Saenz v. Roe*, 526 U.S. 489, 500 (1999). Noticeably absent from this passage is a recognition of any right to *intrastate* travel. *See generally Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 255-56 (1974) (declining to decide whether a constitutional distinction exists between interstate and intrastate travel).

Moreover, the Supreme Court explicitly differentiated between these two types of travel in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993). The plaintiffs in *Bray* alleged that, by obstructing access to abortion clinics, the defendants violated 42 U.S.C. § 1985(3) by interfering with the plaintiffs' right to interstate travel. *Bray*, 506 U.S. at 266-67. In holding that the plaintiffs failed to show a conspiracy to violate their federal rights, the Court explained that the defendants' proposed demonstrations would not implicate the right to interstate travel because the record established that the defendants' actions would have restricted only intrastate travel:

As far as appears from this record, the only "actual barriers . . . to movement" that would have resulted from petitioners' proposed demonstrations would have been in the immediate vicinity of the abortion clinics, restricting movement from one portion of the Commonwealth of Virginia to another. Such a purely intrastate restriction does not implicate the right of interstate travel, even if it is applied intentionally against travelers from other States, unless it is applied *discriminatorily* against them.

institution." *Id*. at 302. This language, rather than an asserted liberty interest in "[t]he freedom from physical restraint," or "the right of a child to be released from all other custody into the custody of its parents, legal guardian, or even close relatives," constituted the "careful description of the asserted right" that is necessary in the substantive-due-process analysis. *Id*. (internal quotation marks omitted).

In addition to emphasizing the significance of the definition of the asserted fundamental interest implicated in a particular case, the Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992); *see also Moore v. City of East Cleveland*, 431 U.S. 494, 502 (1977) (plurality opinion) (noting that "[s]ubstantive due process has at times been a treacherous field for this Court"). The Court has explained the reason for this hesitation as follows:

> By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

*Glucksberg*, 521 U.S. at 720 (internal quotation marks and citation omitted). I believe that this court, like the Supreme Court, must proceed with caution before expanding previously recognized liberty interests to encompass situations that have not yet been encountered.

**A. Right to intrastate travel**

As the majority recognizes, the Supreme Court has described the contours of the right to travel as follows:

*Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645) (1944)).[5]

Both Supreme Court precedent and our national tradition suggest that a family member's right to participate in child rearing and education is one of the most basic and important associational rights protected by the Constitution. *Cf. M.L.B. v. S.L.J.*, 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (plurality opinion) ("Choices about marriage, family life, and the *upbringing of children* are among associational rights this Court has ranked as of basic importance in our society, rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect.") (quoting *Boddie v. Connecticut*, 401 U.S. 371, 376, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)) (internal punctuation omitted) (emphasis added); *Moore*, 431 U.S. at 503-04 ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural.") (footnotes omitted); *see also Roberts*, 468 U.S. at 619-620 ("Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.").

---

[5] Citing *Meyer v. Nebraska*, 262 U.S. 390, 399-401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Roe v. Wade*, 410 U.S. 113, 152-153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Wisconsin v. Yoder*, 406 U.S. 205, 231-233, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Poe v. Ullman*, 367 U.S. 497, 542-544, 549-553, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting); *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *May v. Anderson*, 345 U.S. 528, 533, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

Moreover, nothing in our tradition or precedent can credibly be read to suggest that the right to participate in child rearing does not extend to grandparents. *See, e.g., Moore*, 431 U.S. at 504 ("Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition.") (emphasis added) (footnote omitted).

### C.

Neither the Supreme Court nor this court, however, has addressed the specific issue of whether a grandmother has a fundamental freedom of association right to participate in the upbringing of her grandchildren.

Our decision in *Bazzetta v. McGinnis*, 286 F.3d 311, 316 (6th Cir. 2002), provides some guidance. There, we examined the constitutional validity of a prison regulation that prohibited prisoners from receiving visits from their minor siblings, nieces and nephews. We struck down the regulation because it was unrelated to legitimate penological goals. *Id.* Implicit in our analysis was the recognition that an inmate's ability to visit with his or her minor siblings, nieces and nephews involves constitutionally protected associational rights. *See id.* at 317 ("Close analysis is especially appropriate when, as is the case here, the challenged restrictions interfere with family relationships . . . specially protected by the Constitution."). The right to participate in the upbringing of one's grandchild occupies a basic position in our society's hierarchy of values and is of a more intimate – and therefore more fundamental – nature than the right to visit one's nieces or nephews. Therefore, a logical extension of *Bazzetta*'s reasoning suggests that Johnson has a fundamental freedom of association right to participate in the upbringing of her grandchildren.

objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest.

*Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotation marks and citations omitted); *see id.* at 728 (holding that "the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause").

This need for a "careful description of the asserted fundamental liberty interest" appears repeatedly in the Supreme Court's decisions involving substantive due process. In *Glucksberg*, for example, the Court was faced with a challenge to a prohibition on physician-assisted suicide. The Court expressly rejected framing the issue in terms of whether individuals have "a liberty interest in determining the time and manner of one's death," "a right to die," "a liberty to choose how to die," or "a right to control of one's final days." *Id.* at 722 (internal quotation marks omitted). Instead, the Court explained that "the question before us is whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so." *Id.* at 723.

The Supreme Court similarly rejected broad definitions of the asserted liberty interest in *Reno v. Flores*, 507 U.S. 292, 315 (1993), where it upheld the constitutionality of regulations promulgated by the Immigration and Naturalization Service that addressed the circumstances and terms under which detained juvenile aliens could be released pending their deportation hearings. In particular, the Court framed the issue in terms of "the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care

———————————

**DISSENT**

———————————

RONALD LEE GILMAN, Circuit Judge, dissenting. The majority has concluded that the ordinance in question violated the plaintiffs' fundamental rights to intrastate travel and to freedom of association. To the contrary, I am of the opinion that this court has previously held that no fundamental right to intrastate travel exists. Moreover, I do not share the majority's belief that the ordinance violated the plaintiffs' rights to freedom of association. I therefore conclude that the ordinance did not infringe upon the plaintiffs' fundamental rights. The ordinance was thus subject to the lower standard of rational basis review, which I believe it met. I also conclude that the ordinance did not violate the Double Jeopardy Clause of the Fifth Amendment, an issue that the majority had no need to reach. For all of these reasons, I would reverse the judgment of the district court.

## I.  FUNDAMENTAL RIGHTS

The majority concludes that the ordinance infringed upon the rights of both Johnson and Au France to intrastate travel, Johnson's right to assist in raising her grandchildren, and Au France's right to visit his attorney. According to the majority, each of these rights constitutes a fundamental liberty interest. I respectfully disagree. Before discussing each of these purported rights in detail, I believe that a few general comments about substantive due process are warranted.

The Supreme Court's approach to determining whether a particular right is protected by the Fourteenth Amendment's Due Process Clause establishes the framework for my analysis:

> Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are,

*Bazzetta*'s implicit conclusion, that a prisoner has a right to receive certain family members as visitors, is in some tension with this court's prior conclusion in *Thompson v. Ashe*, that a plaintiff had "no fundamental right to visit his family members on [a public housing development's] property." 250 F.3d at 406-07.

In *Thompson*, the plaintiff challenged the constitutionality of a "no trespass" list, which kept him from visiting family members in a public housing development.[6]   *Id.*   The *Thompson* court addressed the issue as follows:  First, it acknowledged that the Bill of Rights protects the right to "enter into and maintain certain intimate or private relationships" and listed specific relationships that the "Supreme Court has accorded constitutional protection to." *Id.* (noting that the Supreme Court "has accorded constitutional protection to marriage, the begetting and bearing of children, child rearing and education, and cohabitation with relatives") (citations omitted).   The *Thompson* court then noted that the plaintiff did not claim an association interest to which the Supreme Court had previously accorded constitutional protection – i.e., cohabitation with relatives – and that the "Court has not extended constitutional protection to mere visitation with family members." *Id.* (emphasis added). Without further explanation, the *Thompson* panel concluded that the plaintiff did not have a fundamental right to visit his family members.

Put more succinctly, *Thompson* concluded that the plaintiff had no fundamental right to visit his family members because the Supreme Court had not yet articulated such a right. That the Supreme Court's recognition of a right establishes that right's existence for lower courts, however, tells us nothing about the existence of rights that the Court has not yet addressed. Unless one accepts the indefensible premise that the absence of a Supreme Court opinion on the existence of

———————————

[6]Beyond a passing reference to a brother, *Thompson* does not specify which of the plaintiff's family members lived in the housing project.

a particular right means that a particular right does not exist, there is simply no reason to infer the absence of a fundamental right to visit a family member based on the fortuity that the Supreme Court has not yet addressed the issue.

Notwithstanding our concerns, we nevertheless would be bound by *Thompson*'s conclusion – as opposed to *Bazzetta*'s implicit conclusion – if Johnson had merely asserted a fundamental right to visit her daughter or grandchildren. 6th Cir. R. 206(c); *see also United States v. Smith*, 73 F.3d 1414, 1418 (6th Cir. 1996).

The issue before this court, however, is whether Johnson has a fundamental associational right to participate in the education and rearing of her grandchild. Unlike the plaintiff in *Thompson*, Johnson has been an active participant in the lives and activities of her grandchildren, with the consent and support of the children's mother. *Thompson* itself recognized the distinction between participating in child rearing and merely visiting one's family. *See Thompson*, 250 F.3d at 407 (acknowledging that "[t]he Court has accorded constitutional protection to . . . child rearing and education") (citing *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)). Moreover, to the extent that *Thompson* can be read to proclaim the absence of a fundamental right to participate in child-rearing it conflicts with Supreme Court precedent and cannot bind this court. *See Pierce*, 268 U.S. at 534-35 (recognizing a fundamental child-rearing right); *Meyer*, 262 U.S. at 398 (noting that "without doubt" the liberty interest guaranteed by the Fourteenth Amendment denotes the right to "establish a home and bring up children").

Accordingly, we find that Johnson does have a fundamental freedom of association right to participate in the upbringing of her grandchildren.

apply."); *see also Nunez*, 114 F.3d at 948 (finding San Diego's ordinance "problematic" because it did not "provide exceptions for many legitimate activities, with or without parental permission")

C.

In striking down the Ordinance, we do not foreclose the possibility that a narrower version of the Ordinance, supported by a clearer record, could withstand strict scrutiny. Temporary exclusion is an extreme measure, but we recognize that municipalities like the City of Cincinnati face formidable challenges in improving the safety and well-being of its citizens in high crimes areas. While we have every confidence that the City acted in the utmost good faith and with the best intentions in enacting the Ordinance, the Ordinance, in its present form, does not withstand constitutional scrutiny.[10]

VII.

For the foregoing reasons, we AFFIRM the judgment of the district court.

_____

[10]Because we find that the Ordinance unconstitutionally infringes on plaintiffs' rights to freedom of association and a right to localized travel, we do not reach Au France's double jeopardy claim.

And, as a homeless individual, Au France lacked access to a private telephone to seek and receive legal advice. Given the obviously privileged nature of his conversations, it cannot be said that Au France's access to the City's predominantly, unenclosed public phones, alleviated his problem of access. An urban street corner simply does not provide a sufficient guarantee of privacy and a realistically effective guard against disclosure of privileged and confidential information to be considered a viable alternative. Even if Au France secured a wholly enclosed public phone, he is homeless, and thus, in all likelihood lacks the money for anything more than a short conversation with his attorney. Thus, the Ordinance not only blocked Au France's physical access to his attorney's office, it effectively blocked all access to his attorney. While this a troubling scenario regardless of the underlying factual circumstances, it is particular troubling in Au France's case. Au France is a homeless man, existing at the margins of our society, where he is uniquely vulnerable and in particular need of unobstructed access to legal representation and a buffer against the power of the State.

In evaluating plaintiffs' associational challenges, we encounter the same flaws in the Ordinance that we encountered in evaluating the right to localized travel. Namely, the combination of the broad sweep of the Ordinance and the lack of individualized consideration prior to exclusion. And, while the variance mechanism has the effect of protecting some associational rights, it does not protect the associational rights of either Johnson or Au France. In this respect, the Ordinance's variance mechanism deviates from the variance procedures utilized in the juvenile curfew ordinances upheld by our sister circuits. In those cases, the operative variance specifically exempted constitutionally protected activity. *See Schleifer v. City of Charlottesville*, 159 F.3d 843, 852 (4th Cir. 1998) ("Under Charlottesville's curfew, minors are allowed . . . to undertake interstate travel; and to engage freely in any activity protected by the First Amendment."); *Qutb v. Strauss*, 11 F.3d 488, 494 (5th Cir. 1993) ("Most notably, if the juvenile is exercising his or her First Amendment rights, the curfew ordinance does not

### D.

Our analysis of Au France's claim – that the Ordinance infringes on his freedom of association right to visit his attorney – is more straightforward. Much of our system of law is based upon the presumption that one of the most important relationships for "safeguarding of individual freedom" is that between an individual and his or her attorney. *See Roberts*, 468 U.S. at 617-618. It simply cannot be denied that an individual's relationship with his or her attorney "acts as a critical buffer between the individual and the power of the State." *See id.* Accordingly, we find that Au France has a fundamental freedom of association right to visit his attorney.

### VI.

Having addressed the existence of the relevant rights, we now turn to whether the Ordinance infringes on those rights, and if it does, whether it is nevertheless sufficiently tailored to allow the Ordinance to pass judicial scrutiny.

### A.

#### 1.

Ordinarily, where a fundamental liberty interest protected by the substantive due process component of the Fourteenth Amendment is involved, the government cannot infringe on that right "unless the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721 (citation omitted); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood*, 699 F.2d 303, 309 (6th Cir. 1983). Notwithstanding this general rule, the City contends that the intermediate scrutiny applicable to content-neutral time, place and manner regulations of otherwise protected First Amendment activity should guide our review of the Ordinance. In support of its contention, the City relies primarily on the Third Circuit's decision upholding the City of York's anti-cruising ordinance, which prohibited driving repeatedly through a loop of certain major public

roads through York's center.  *Lutz*, 899 F.2d at 270.  But instead of regulating the manner in which affected individuals access Over the Rhine (i.e., an anti-cruising ordinance), or the time of access (i.e., a curfew), the Ordinance imposes a more severe restriction, broadly prohibiting individuals to access the entire neighborhood,[7] which the City advertises as the largest national historic district in the nation, the City's fastest growing entertainment district and home to nearly 10,000 City residents.[8]  Thus, while we acknowledge the strength of the Third Circuit's reasoning,[9] and we do not foreclose the possibility of applying intermediate scrutiny to a less severe regulation of localized travel, the broad prohibition of the Ordinance requires that we apply strict scrutiny.

---

[7]Unlike a "time" or "manner" regulation, a "place" regulation is more difficult to transfer from the First Amendment context to the localized travel context.  After all, regulating the place of speech does not foreclose speech or association in the same way as regulating the place of travel might.  Nevertheless, we do not foreclose the possibility that a narrow "place" restriction might be more appropriately analyzed under intermediate scrutiny.

[8]*See* http://www.cincinnatihome.org/neighborhoods/overtherhine.

[9]As Judge Becker explained:

[J]ust as the right to speak cannot conceivably imply the right to speak whenever, wherever and however one pleases – even in public fora specifically used for public speech – so too the right to travel cannot conceivably imply the right to travel whenever, wherever and however one pleases – even on roads specifically designed for public travel.  Unlimited access to public fora or roadways would result not in maximizing individuals' opportunity to engage in protected activity, but chaos.  To prevent that, state and local governments must enjoy some degree of flexibility to regulate access to, and use of, the publicly held instrumentalities of speech and travel.

899 F.2d at 269.

### 4.

Finally, the Ordinance's variance mechanism does not save the Ordinance from constitutional infirmity because it only protects the constitutional right to localized travel for a limited group of affected individuals.  In allowing individuals to seek variances if they live or work or seek social services in Over the Rhine, the Ordinance effectively preserves the right to travel locally through public spaces and roadways for some individuals.  However, the Ordinance does nothing to protect the constitutional rights of all other affected individuals.  The Ordinance's variance mechanism eases some of the burden of exclusion for some individuals, but it does not alleviate the fundamental constitutional problem that the Ordinance blocks the right to travel locally through public spaces and roadways.

### B.

### 1.

The Ordinance also implicates Johnson and Au France's rights to freedom of association.  Prior to receiving an exclusion notice, Johnson actively participated in caring for five of her grandchildren, all of whom resided in Over the Rhine. Johnson regularly picked up two of her grandchildren, Tania and Jaquanna, and walked them to and from school. After her arrest and ninety day exclusion, Johnson was effectively banished from Over the Rhine, and precluded from her regular role in caring for her grandchildren.  Therefore, the Ordinance plainly infringed on Johnson's right to participate in the rearing of her grandchildren.

Along similar lines, Au France's exclusion from Over the Rhine prohibited him from  traveling to his attorney's office in Over the Rhine.  In Au France's case, this exclusion was particularly problematic because Au France was homeless, thus he had no readily available, realistic alternative to communicate with his attorney.  For example, Au France's lawyer could not take the exceptionally accommodating step of making a "house call" to discuss Au France's legal affairs.

the "use of foot patrols, bicycle patrols, and use of the District One Criminal Apprehension Team," and put forth some evidence demonstrating these efforts were ineffective in reducing drug-related crime in Over the Rhine. Similarly, while we credit the City's statistical evidence regarding covert operations, such evidence does not demonstrate the ineffectiveness of other law enforcement operations.

The City's citation to the experiences of Portland, Oregon is also misplaced in considering narrow tailoring. Even if we were to extrapolate that what worked in Portland would likely work in Over the Rhine, this fact would not sustain the Ordinance. In considering whether a government regulation is narrowly tailored, it is not enough that the regulation achieves its ostensible purpose, it must do so without unnecessarily infringing upon constitutionally protected rights.

Beyond its conclusory claims that other efforts to combat drug crime were unsuccessful, the police department's report does not contain any indication that the City or its police department evaluated alternatives to the Ordinance. Faced with such a record, we cannot conclude that other alternatives could not achieve the same intended goals of the Act. While we are prepared to accept the legislative judgment of the City regarding potential alternatives, *see Grutter*, 288 F.3d at 751, the City nevertheless bears the burden of identifying potential alternatives. Given the nature of the right at issue – indeed, the Ordinance itself proclaims that "[i]ndividuals have a significant private interest in being able to travel and associate freely in all areas of the city" – the City must do more to consider potential alternatives. It is, of course, possible that a regulation like the Ordinance might be the narrowest method of addressing a seemingly uncontrollable drug and crime epidemic. But without some affirmative evidence that there is no less severe alternative, we cannot conclude that the Ordinance, in its present form, survives constitutional scrutiny.

2.

We agree with the district court's conclusion that the City's interest in enacting the Ordinance – to enhance the quality of life in drug-plagued neighborhoods and to protect the health, safety, and welfare of citizens in those areas – represents a compelling government interest. The question, then, is whether the Ordinance is narrowly tailored to serve that interest.

To determine whether the Ordinance is narrowly tailored to achieve the City's compelling interest in reducing drug abuse and drug-related crime, we (1) assess whether the Ordinance implicates an individual's interest in localized travel with specific reference to the precise nature of the infringement and (2) determine whether the Ordinance is the least restrictive means to accomplish the City's goal. In making this latter inquiry, we ask whether any other methods exist to achieve the desired results of enhancing the quality of life and protecting the health, safety, and welfare of citizens in high drug-crime neighborhoods. "[I]f there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'" *Dunn*, 405 U.S. at 343.

The Ordinance bars excluded individuals from each and every public space and roadway in Over the Rhine. In our view, the right to travel locally through public spaces and roadways is essentially a right of access. By blocking affected individuals' access to an entire metropolitan neighborhood of 10,000 people, the Ordinance therefore plainly infringes on the right to localized travel through the public spaces and roadways of Over the Rhine.

In denying access, the Ordinance initially presents constitutional tailoring problems because it broadly excludes individuals from Over the Rhine without regard to their reason for travel in the neighborhood. Thus, the Ordinance prohibits Johnson from engaging in an array of not only wholly innocent conduct, but socially beneficial action like

caring for her grandchildren and walking them to school. Likewise, the Ordinance bans Au France from seeking food, shelter, social services and meeting with his attorney in the Over the Rhine, at the same time it bans him from pursuing illegal drugs in Over the Rhine.

The broad sweep of the Ordinance is compounded by the fact that the Ordinance metes out exclusion without any particularized finding that a person is likely to engage in recidivist drug activity in Over the Rhine. In *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Supreme Court upheld the Bail Reform Act of 1984, which allowed for the pretrial detainment of arrestees. *Id*. at 750-52. The Court acknowledged the "importance and fundamental nature" of an individual's interest in liberty, but emphasized that "this right may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society." *Id*. at 750-51. Thus, "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, we believe that, consistent with the Due Process Clause, a court may disable the arrestee from executing that threat." *Id*. at 751.

In stark contrast to the Bail Reform Act, the Ordinance (1) automatically applies to persons arrested or convicted without any individualized consideration, let alone consideration by a neutral arbiter, and (2) does not require any particularized finding that the arrested or convicted individual is likely to repeat his or her drug crime. In place of the Bail Reform Act's neutral, individualized adjudication, the Ordinance relies on only general evidence that individuals arrested and/or convicted for drug activity in Over the Rhine typically return to the neighborhood and repeat their offenses. While we credit this general evidence, it is insufficient to override an individual's interest in localized travel. In the same way that due process demands certain procedural safeguards before an individual can be detained pending trial, we find that due process also demands some individualized consideration before an individual's right to localized travel

can be restricted. Along with the broad sweep of the Ordinance, the City's failure to include procedural safeguards resembling the protections incorporated into the Bail Reform Act, weighs heavily against finding the Ordinance constitutional.

Above all, we are most troubled by the prior version of the Ordinance because it curtailed an individual's right to localized travel even after his or her drug charge was dropped or abandoned. In practice, then, the Ordinance undoubtedly penalized innocent individuals. By excluding innocent individuals, the Ordinance not only unquestionably violated the constitutional rights of affected individuals, it failed to serve the purposes of the Act.

### 3.

With respect to less restrictive alternatives, the City contends that the Ordinance is narrowly tailored because the City's "other attempts to curb the incidence of drug crime failed." In support of this assertion, the City argues that drug and prostitution activity remained constant in Over the Rhine, notwithstanding "an effort to increase police presence in the area through the use of foot patrols, bicycle patrols, and use of the District One Criminal Apprehension Team." Similarly, the City cites the report's statement that, "In July of 1995, several covert operations resulted in the arrests of 16 persons for soliciting prostitution, as well as 5 persons for felony drug violations. Even though covert operations continued on a monthly basis, seven months later, efforts in February and March of 1996, still resulted in 21 soliciting arrests and 50 various drug arrests."

We, of course, "do not demand of legislatures scientifically certain criteria of legislation." *Ginsburg v. New York*, 390 U.S. 629, 642, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (internal quotations omitted). But when constitutional rights are at issue, strict scrutiny requires legislative clarity and evidence demonstrating the ineffectiveness of proposed alternatives. *See Grutter v. Bollinger*, 288 F.3d 732, 749-51 (6th Cir. 2002). Thus, the City would have to provide some detail on